**Rayfield NEWLON, Appellee,**

v.

**William ARMONTROUT, Appellant.**

**No. 88–2385.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1989.

Decided Sept. 18, 1989.

Rehearing Denied Nov. 15, 1989.

Stephen D. Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellant.

Richard H. Sindel, Clayton, Mo., for appellee.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

The State of Missouri appeals from the district court's[1] order granting Rayfield Newlon's 28 U.S.C. § 2254 petition for writ of habeas corpus, vacating Newlon's death sentence, and ordering the State to either resentence Newlon to life imprisonment without parole for fifty years or grant him a new penalty phase trial. *See Newlon v. Armontrout*, 693 F.Supp. 799 (W.D.Mo. 1988). We conclude that the State's arguments alleging error on the part of the district court do not warrant a reversal of the district court's grant of habeas relief.

Accordingly, we affirm the district court's order.

I.

On the night of April 24, 1978, Mansfield Dave, the proprietor of a family-owned convenience store in Kinloch, Missouri, was killed while working alone in the store. Although no one witnessed the murder, Dave's wife saw a young man (later identified as Franz Williams) as she was running to the store from the nearby Dave house in response to the alarm. She noted that the young man appeared empty handed. When Mrs. Dave arrived at the convenience store, she found Mr. Dave lying dead behind the counter with two bullet wounds in his upper body—one in the upper left chest and the other in the upper left shoulder. When the police investigated the scene, they found two spent 16–gauge shotgun shells, which police later identified as coming from a sawed-off shotgun that they traced to Walter West's house. Police also found a cold bottle of Nehi orange soda bearing Williams' fingerprints sitting on the counter.

The evidence linked three individuals to Mr. Dave's murder: Franz Williams, Walter West and Rayfield Newlon. Franz Williams was initially charged with capital murder, but pled guilty to felony murder. Walter West pled guilty to second degree murder and received a recommended prison term of ten years in an out-of-state penitentiary in exchange for his testimony at Rayfield Newlon's trial. Rayfield Newlon was tried by a jury, convicted of capital murder and sentenced to death.

An indictment filed August 4, 1978, charged petitioner Newlon with capital murder "in that [Newlon], acting with others, feloniously, unlawfully, willfully, knowingly, and deliberately and with premeditation, killed Mansfield Dave." *See* Mo.Rev.Stat. § 565.001 (1978). The evidence connecting petitioner with the crime consisted of Walter West's testimony and statements petitioner made to police while

---

1. The Honorable Scott O. Wright, Chief Judge of the United States District Court for the Western District of Missouri.

he was in custody.[2]

At the close of the evidence, instructions, and arguments of counsel, the jury found petitioner guilty of capital murder. Mo. Rev.Stat. § 565.001 (1978). Neither side offered any additional evidence at the penalty phase of the trial, which was held the morning after the jury returned its guilty verdict. Both the prosecutor and petitioner's trial counsel argued during the penalty phase, and the trial court gave additional instructions to the jury, which returned a sentence of death.

The Missouri Supreme Court affirmed Newlon's conviction and sentence on direct appeal. *State v. Newlon*, 627 S.W.2d 606 (Mo.) (en banc), *cert. denied*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982). After his conviction was affirmed, petitioner filed a motion to vacate his sentence pursuant to Missouri Supreme Court Rule 27.26.[3] After an evidentiary hearing at which petitioner presented additional evidence, a St. Louis County circuit court denied Newlon's 27.26 motion. The Missouri Court of Appeals affirmed the denial of the 27.26 motion and denied a request for a rehearing or transfer to the Missouri Supreme Court. *Newlon v. State*, 705 S.W.2d 590 (Mo.App. 1986).

Having exhausted his available state remedies, Newlon commenced the present action for federal habeas corpus relief in federal district court, challenging the imposition of the death penalty. Newlon advanced the claims that: (1) he was denied due process of law due to the improper nature of the prosecutor's penalty phase argument, which was not only inflammatory and prejudicial, but also diminished the jury's sense of responsibility in imposing the death penalty; (2) he was denied his right to effective assistance of counsel during the penalty phase of the trial; (3) the trial court unconstitutionally limited the factors the jury could consider in mitigation of the death penalty; and (4) Missouri's "depravity of mind" instruction on aggravating circumstances was unconstitutionally vague.

The district court, after an additional hearing, found a constitutional violation in each instance advanced by Newlon and granted the writ.[4] The district court opin-

---

**2.** Prior to his conviction, petitioner made three conflicting statements regarding his involvement in the murder. In an initial statement to the police, he admitted to helping West and Williams saw off a shotgun and to going with them to the convenience store intending to rob it. He contended, however, that he had stayed in the car while West and Williams went inside. In a later statement which was videotaped by the police, petitioner admitted that he had entered the convenience store with Williams, but alleged that Williams had done the shooting while petitioner was at the back of the store. In this statement, petitioner also asserted that, before entering the store, Williams had expressed the possibility that he "might have to shoot" Mr. Dave because he knew him. In petitioner's testimony during the guilt phase of his trial, he denied being present at the scene and denied killing Mr. Dave.

Walter West testified at trial that Williams came from the back of the store just as petitioner was at the counter "messing around with the shotgun." According to West, who stated that he observed the incident from his vantage point sitting in his automobile parked in a lot across the street from the store (the entryway of which was approximately five feet below street level), when Mr. Dave turned around there were two consecutive "puffs of smoke," and then Williams and petitioner fled from the store. West quoted

petitioner as reporting to him later that "I had to burn him." Williams did not testify at the trial.

**3.** Rule 27.26 was repealed effective January 1, 1988. Postconviction relief in Missouri is now available under Missouri Supreme Court Rule 29.15.

**4.** We note, for purposes of clarity, that the district court did not find the Missouri aggravating circumstance statute facially invalid. Rather, the court found that Newlon's death sentence was unconstitutional because the state trial court's application of the statute was arbitrary and capricious. *Newlon v. Armontrout*, 693 F.Supp. 799, 813 (W.D.Mo.1988). As the district court noted, "[a]lthough the Supreme Court has not held such language to be facially unconstitutional, it has 'not stopped at the face of the statute but [has] probed the application of statutes to particular cases.'" *Id.* at 812 (citations omitted). The court went on to hold that "[a]bsent a clear, limiting directive, the words 'depravity of mind' in this case are not capable of objective determination." *Id.* at 813. Similarly, we do not find the Missouri aggravating circumstance unconstitutional on its face, but find Newlon's death sentence unconstitutional based on the state trial court's unconstitutional application of the statute.

ion addressed each of Newlon's claims on its merits. In an order dated June 2, 1988, the district court directed that Newlon be given a new penalty phase trial or, in the event that the State chose not to give Newlon a new trial, that he be relieved of the sentence of death and imprisoned for life with no opportunity of parole for fifty years. *Newlon v. Armontrout*, 693 F.Supp. 799 (W.D.Mo.1988).

For reversal, the State of Missouri argues that the district court erred in finding Missouri's aggravating circumstance instruction vague because the Missouri Supreme Court has defined "depravity of mind" in such a way as to narrow the sentencer's discretion. The State also contends that the prosecutor's penalty phase closing argument was proper and not prejudicial because there is no reasonable probability that it affected the outcome of the penalty phase. We address each of these arguments in turn.[5]

## II.

The verdict form returned by the jury when they imposed the death penalty indicated only that the jury found "Aggravating Circumstance No. 2" in "Instruction No. 19." Instruction No. 19 required the jury to find one of two aggravating circumstances before returning a verdict of death:

1. Whether the Defendant murdered Mansfield Dave for the purpose of receiving money or any other thing of monetary value.

2. Whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman.

The instruction was based on Mo.Rev.Stat. § 565.012.2(7) (1978), which provides for a statutory aggravating circumstance if the "offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind."[6] Because the death sentence would fail if the single

aggravating circumstance was invalid, the district court focused on the validity of the phrase "depravity of mind." The district court found that "[a]bsent a clear, limiting directive, the words 'depravity of mind' in this case are not capable of objective determination." 693 F.Supp. at 812–13. The court relied on standards set forth in *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), and that case's progeny in holding the instruction unconstitutionally vague. 693 F.Supp. at 813.

On appeal, the State claims that the district court erred in finding the "depravity of mind" instruction unconstitutionally vague. The State submits that the instruction adequately channeled the jury's discretion in considering the death penalty because the Missouri Supreme Court construes "depravity of mind" narrowly. In response, Newlon focuses on the trial court's failure to define "depravity of mind" for the jury, alleging that the jury was not given adequate information and guidance from clear and objective standards to decide the existence of aggravating circumstances. Newlon also takes issue with the State's claim that the Missouri Supreme Court has defined the scope of the phrase "depravity of mind."

## A.

Before we address the constitutionality of the "depravity of mind" instruction, we must consider as a threshold issue whether the rule adopted by the district court and urged on us by Newlon is a "new rule" for purposes of retroactivity. *Teague v. Lane*, —— U.S. ——, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion by Justice O'Connor, with Chief Justice Rehnquist, Justice Scalia and Justice Kennedy joining in the opinion, and Justices Stevens and Blackmun concurring in the judgment) (requiring courts to determine retroactivity as threshold matter in cases on collateral review); *see Penry v. Lynaugh*, —— U.S.

---

5. The State also challenges the district court's finding of ineffective assistance of counsel at the penalty phase. Because we base our affirmance on the first two issues, however, we need not address the effectiveness of trial counsel.

6. Section 565.012.2(7) was replaced by Mo.Rev. Stat. § 565.032.2(7) (1988).

——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989); *Bruner v. Perini*, 875 F.2d 531 (6th Cir.1989). Under *Teague*, we cannot "announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others similarly situated." 109 S.Ct. at 1078. The *Teague* plurality adopted a new retroactivity approach which precludes us from announcing or applying a new constitutional rule of criminal procedure in a case on collateral review unless the case falls within one of two exceptions. *Id.* 109 S.Ct. at 1075, 1078.

*Teague* involved the appeal of a district court's denial of a writ of habeas corpus. The petitioner challenged his conviction on the ground that the prosecutor had used all of his peremptory challenges to exclude blacks from the jury, resulting in an all-white jury. The petitioner argued that the equal protection clause of the fourteenth amendment and the fair cross-section requirement of the sixth amendment prohibited the exclusion of petit jurors on the basis of race. The Court rejected the petitioner's equal protection claim, based on *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986) (per curiam), because petitioner's conviction became final before *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), was decided. The Court did not rule on the merits of petitioner's sixth amendment claim because a decision applying the rule that the jury venire be drawn from a fair cross-section of the community to the petit jury would not apply retroactively to cases on collateral review.

The plurality held that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 109 S.Ct. at 1075. The Court defined a new rule as one which "breaks new ground or imposes a new obligation on the States or the Federal Government," or, "[t]o put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 1070 (emphasis in original). The Court identified two exceptions to the general rule of non-retroactivity. First, "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Id.* at 1075, *quoting Mackey v. United States*, 401 U.S. 667, 692, 91 S.Ct. 1160, 1180, 28 L.Ed.2d 404 (1971) (separate opinion of Harlan, J.). Second, a new rule should be applied retroactively if it requires the observance of "procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* 109 S.Ct. at 1075, 1076–77.[7] Applying this retroactivity approach to the facts in *Teague*, the Court held that application of the fair cross-section requirement to the petit jury would be a new rule which, because it did not fall within an exception, would not apply retroactively to cases on collateral review. 109 S.Ct. at 1075–77.[8]

Although the plurality opinion in *Teague* did not decide whether this new retroactivity approach would apply in the capital sentencing context, a recent Supreme Court case extended the *Teague* approach to capital cases. *Penry v. Lynaugh*, —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). *Penry* addressed two questions:

First, was Penry sentenced to death in violation of the Eighth Amendment because the jury was not adequately instructed to take into consideration all of his mitigating evidence and because the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to his mitigating evidence in answering them? Second, is it cruel and unusual punishment under the Eighth Amendment to execute a mentally retarded person with Penry's reasoning ability?

109 S.Ct. at 2943–44.

With respect to the first issue, relating to the jury's ability to give effect to miti-

---

**7.** We need not address the application of these exceptions in *Newlon*, as we find that the rule is not a "new rule" for retroactivity purposes.

**8.** The "new rule" aspect of *Teague* is extensively analyzed en banc in *Sawyer v. Butler*, 881 F.2d 1273 (5th Cir. (La.), 1989) (1989 W.L. 90696).

gating evidence in deciding whether to impose the death penalty, the Court found that the rule sought by Penry was not a "new rule" under *Teague*. After discussing *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding the Texas death penalty statute as valid on its face), the *Penry* Court concluded that Penry merely asked the State "to fulfill the assurance upon which *Jurek* was based: namely, that the special issues would be interpreted broadly enough to permit the sentencer to consider all of the relevant mitigating evidence a defendant might present in imposing sentence." 109 S.Ct. at 2945. Furthermore, Supreme Court precedent in effect at the time Penry's conviction became final clearly mandated that a state could not prevent a sentencer from considering evidence relevant to the defendant's background or character or to circumstances of the offense that militate against imposing the death penalty. *Id.* at 2946. The *Penry* Court therefore reached the merits of the first issue.

In contrast, the *Penry* Court found that the second question, regarding the constitutionality of executing a mentally retarded person with Penry's reasoning ability, presented a potential "new rule." 109 S.Ct. at 2952. Such a rule was not dictated by existing precedent and would impose a new obligation on the States and Federal Government. *Id.* The Court found, however, that such a rule would fall under the first exception to the general rule of nonretroactivity because it would prohibit "a certain category of punishment for a class of defendants because of their status or offense." *Id.* at 2953. Accordingly, the Court addressed the merits of Penry's second claim.

█ The first rule sought by Newlon and opposed by the State is that the imposition of the death penalty in this case, based on the jury's finding that the murder was "outrageously or wantonly horrible, or inhuman in that it involved depravity of mind," did not "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance'" for purposes of *Godfrey v. Georgia*,

446 U.S. 420, 428, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980) (plurality opinion), *quoting Gregg v. Georgia*, 428 U.S. 153, 198, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976). The rule in question is not a "new rule" under *Teague* and *Penry* because it is dictated by case law existing at the time Newlon's conviction became final.

Newlon's conviction became final on October 4, 1982, when the United States Supreme Court denied his petition for certiorari on direct review of his conviction and sentence. *Newlon v. Missouri*, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *see Penry*, 109 S.Ct. at 2944 (conviction became final when Supreme Court denied review). *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion), were rendered before Newlon's conviction became final. This court views *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), as an application, not an expansion, of *Godfrey*. *See Mercer v. Armontrout*, 864 F.2d 1429 (8th Cir.1988), *stay denied*, —— U.S. ——, 109 S.Ct. 773, 102 L.Ed.2d 766 (1989) (*Mercer II*). Newlon is therefore entitled to the benefit of those decisions.

Because our decision on the constitutionality of the "depravity of mind" instruction is based on precedent existing at the time Newlon's conviction became final, any rule we announce in this case will be applied retroactively to Newlon and to others similarly situated. *Teague*, 109 S.Ct. at 1078. Therefore, we shall address the merits of Newlon's first claim.

### B.

Claims of vagueness directed at statutory aggravating circumstances in capital punishment statutes characteristically assert that the challenged provision fails adequately to inform the jury when it must impose the death penalty, leaving the jury with the kind of unfettered discretion held invalid in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). "[T]he channeling and limiting of the sentencer's discretion in imposing the death

penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." *Cartwright,* 108 S.Ct. at 1858 (citations omitted). We analyze such challenges under the eighth amendment. *Id.*

In *Godfrey,* the Supreme Court held unconstitutionally vague a death sentence which was based on the jury's finding that the offense committed was "outrageously or wantonly vile, horrible or inhuman." The *Godfrey* Court held that, to authorize capital punishment, a state must "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. * * * It must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" 446 U.S. at 428, 100 S.Ct. at 1764–65 (citations omitted). Because the channeling function of an aggravating circumstance requires an objective determination by the sentencer, an aggravating circumstance must be described in "terms that are commonly understood, interpreted and applied." *Cartwright v. Maynard,* 822 F.2d 1477, 1485 (10th Cir. 1987), *aff'd,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Otherwise, a standard may be so vague that it would " 'fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman [v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] could occur.'" *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983), *quoting Gregg v. Georgia,* 428 U.S. 153, 195 n. 46, 96 S.Ct. 2909, 2935 n. 46, 49 L.Ed.2d 859 (1976). As the Tenth Circuit recognized in *Cartwright,* " 'if an aggravating circumstance is defined and applied so broadly that it conceivably could cover every first degree murder, then it obviously cannot fulfill its constitutional responsibility to eliminate the consideration of impermissible factors and to provide a recognizable and meaningful standard for choosing the few who are to die.'" 822 F.2d at 1485, *quoting* Rosen, The *"Especially Hei-*

*nous" Aggravating Circumstance in Capital Cases—The Standardless Standard,* 64 N.C.L.Rev. 941, 954 (1986).

■ The record in this case specifically shows that the jury did not know what the phrase "depravity of mind" meant. During penalty phase deliberations, the jury asked the court to define the phrase, but the court advised the jury that it could not give them further instructions. This refusal to clarify the term "depravity of mind" when the jury plainly did not understand the meaning of the phrase and actually sought a limiting directive left the jury free to administer the statute "in an arbitrary and unpredictable fashion." *See California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Absent a clear, limiting directive, the words "depravity of mind" in this case are not capable of objective determination. As in *Godfrey,* "nothing in these few words, standing alone, * * * implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." 446 U.S. at 428, 100 S.Ct. at 1765.

This court considered the "depravity of mind" statutory aggravating circumstance at issue here in *Mercer II.* In *Mercer II,* we found *facially* valid an instruction requiring the jury to determine that "the murder * * * involved depravity of mind and that as a result thereof it was outrageously or wantonly vile and inhuman." 864 F.2d at 1435 n. 4. We found that the state appellate court's review of the issue satisfied the requirements of *Godfrey.* In an earlier case, however, the Missouri Supreme Court had made a specific finding that " '[d]epravity of mind' is demonstrated in this case by the mode of killing preceded by extended sexual and psychological abuse of the victim." *State v. Mercer,* 618 S.W.2d 1, 11 (Mo.) (en banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981) (*Mercer I*). There is no such specific finding in the current case. Furthermore, *Mercer II* did not fully discuss the implications of *Cartwright* because the *Mercer I* jury found two aggravating circumstances, not just one. 864 F.2d at 1435–36 n. 5.

In *Cartwright,* both the Tenth Circuit and the Supreme Court determined that a death sentence was invalid where the Oklahoma Court of Criminal Appeals failed to apply a constitutionally required narrowing construction of "especially heinous, atrocious or cruel." 108 S.Ct. at 1859. The state appellate court's description of the events surrounding the murder and conclusion that those events "adequately supported the jury's finding" did not provide a proper narrowing construction. *Id.* The same situation is present here.

The State argues that consistent with *Godfrey* the constitutional issue is not how an aggravating circumstance instruction is understood by the jury, but whether it is construed and applied properly by the state appellate court in its independent review of a petitioner's sentence. The language of *Godfrey* and its progeny, however, implies that the discretion of the *sentencing body* must be properly channeled. Even assuming that the Missouri Supreme Court *could* have cured the defect in the instructions by imposing a narrow construction of the "depravity of mind" circumstance on review, we find that the construction applied by the Missouri court in this case did not sufficiently narrow the class of persons eligible for the death penalty.

The State's argument that the Missouri courts applied a limiting construction of the statutory aggravating circumstance is based on two post-*Newlon* Missouri cases: *State v. Preston,* 673 S.W.2d 1 (Mo.) (en banc), *cert. denied,* 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984), and *State v. Griffin,* 756 S.W.2d 475 (Mo.1988) (en banc), *cert. denied,* — U.S. —, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). In *Preston,* the Missouri Supreme Court listed factors to be considered in determining "depravity of mind." The *Preston* court specifically noted that a precise definition of "depravity of mind" had not yet been adopted in Missouri. 673 S.W.2d at 11. In *Griffin,* the Missouri court specifically required that the jury find one of the *Preston* factors before finding "depravity of mind." 756 S.W.2d at 490. We find nothing in the Missouri Supreme Court's direct review of *Newlon,* however, to indicate that the court

applied the limiting construction adopted in *Preston* and *Griffin* to *Newlon.* The Missouri Supreme Court basically just recited the facts, then concluded that "the record supports the finding of depravity." *State v. Newlon,* 627 S.W.2d at 622.

After reviewing the entire record, we agree with the district court that the "depravity of mind" instruction was not capable of objective determination by the jury in this case, and that the Missouri Supreme Court did not provide a limiting construction of the term sufficient to satisfy the eighth amendment requirements of *Godfrey* and *Cartwright.*

### III.

The State also challenges the district court's finding that the prosecutor's argument during the penalty phase of Newlon's trial was improper. The State argues that the district court applied the wrong standard of review, that none of the statements made by the prosecutor during his argument were improper, and that even if some of the statements were improper, they do not rise to the level of constitutional error.

### A.

In *Newlon,* the district court used a three-part analysis in reviewing the prosecutor's closing argument. First, the district court addressed petitioner's argument that the jurors were subjected to an argument based on fear, premised on facts not in evidence, and calculated to inflame the jury and remove reason from the sentencing process. In this section, the district court addressed statements in which the prosecutor (1) expressed his personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized his position of authority as prosecuting attorney of St. Louis County; (3) attempted to link petitioner with several well-known mass murderers; (4) appealed to the jurors' personal fears and emotions; and (5) asked the jurors to "kill him now. Kill him now." 693 F.Supp. at 804–06. As part of this analysis, the district court set forth portions of

the prosecutor's argument and analyzed the propriety of each statement.

■ After considering the propriety of each of the several challenged remarks, the district court addressed the issue of whether the prosecutor, by his remarks, and the Missouri state trial court, by its failure to give a curative instruction, diminished the jury's sense of responsibility in imposing the death penalty. These are eighth amendment claims, and the district court correctly used an eighth amendment analysis in determining their propriety. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (holding that remarks by prosecutor in a capital case that misinformed the jury as to the role of appellate review violated the eighth amendment).

Finally, the district court examined the totality of the circumstances in the penalty proceeding:

> In examining the totality of circumstances in the penalty proceeding, this Court is cognizant that defense counsel made no objections and failed to rebut the improper and misleading statements. Moreover, the trial judge made no comments *sua sponte* and issued no curative instructions. The prosecutor's rhetoric continued uninterrupted, and by silence, apparently sanctioned by the trial judge. Although *Donnelly [v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ] 'warns against holding every improper and unfair argument of a state prosecutor to be a federal due process violation, it does not insulate all prosecutorial comments from federal constitutional objections.' *Caldwell,* [472 U.S. at 338,] 105 S.Ct. at 2644.

693 F.Supp. at 808. The court went on to enumerate the factors leading to the find-

ing that the penalty phase trial was fundamentally unfair:

> Here, the prosecutor's misleading comments concerning his personal belief that this case deserved the death penalty more than any other in ten years, the prosecutor's emphasis on his authority as the 'top law enforcement officer of the County,' the comparison to infamous mass-murderers, the personalized analogy to the jurors' self-defense of their own children, the references to war and courage, the insinuation that all murders should be punished with death, and the reassurance that appellate review would follow if a death sentence were rendered, *all combined to infect the penalty proceeding with an unfairness that violates due process.*

*Id.* (emphasis added).

■ In analyzing the prosecutor's closing remarks, we must apply the standard articulated by this court in *Hamilton v. Nix,* 809 F.2d 463 (8th Cir.) (en banc), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987).[9] As this court has recognized, in a section 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow. *Id.* at 470. Not every trial error that might result in reversal of a federal conviction on direct appeal would mandate the same result in a section 2254 review of a state court conviction, where we may consider only errors of constitutional magnitude. *See Darden v. Wainwright,* 477 U.S. 168, 182–83, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986). The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Moore v. Wyrick,* 760 F.2d 884, 886 (8th Cir.1985). Under this

---

**9.** Because we find the closing argument, when viewed in its entirety, violates due process, we need not address Newlon's eighth amendment *Caldwell* claims and the implication of the recent Supreme Court case of *Dugger v. Adams,* —— U.S. ——, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989) (Supreme Court's decision in *Caldwell,* which occurred *after* petitioner's conviction became final, did not provide cause for his procedural default (failure to object at trial) where

state common law rules forbidding jury arguments which would mislead the jury regarding the importance of its decision were in effect when petitioner's conviction became final; therefore, court refused to reach merits of petitioner's *Caldwell* claim on habeas review). There is prejudice enough without relying on the *Caldwell* claims articulated by the district court.

standard, a petitioner must show that there is a "reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Hamilton*, 809 F.2d at 470; *see Tucker v. Kemp*, 802 F.2d 1293, 1295–96 (11th Cir.1986), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).

We cannot agree with the State's argument that the district court's use of both eighth amendment and fourteenth amendment analysis somehow renders its decision improper. Rather, we find that the eighth amendment analysis bolstered the district court's finding of a due process violation. As the Tenth Circuit has stated, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, *see Brooks v. Kemp*, 762 F.2d 1383, 1406 (11th Cir.1985) (en banc), *vacated on other grounds*, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law, *see Darden*, [477] U.S. [at 182–83], 106 S.Ct. at 2472." *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987).

### B.

■ The State focuses its argument on appeal on the perceived lack of prejudice analysis in the district court's opinion. In its brief, the State contends that the court "must look to see if the prosecutor cured his error, whether defense counsel cured the error, or whether the instructions cured the error by properly instructing the jury,"

Appellant's Brief at 22,[10] and complains that the district court erred when it performed this complex analysis in a "mere three sentences." We find the district court's discussion sufficient. With respect to each portion of the prosecutor's argument that the district court found erroneous, the court gave a detailed and well-supported analysis of why a particular statement was improper. *See Newlon*, 693 F.Supp. at 804–08. As is apparent in reviewing the transcript of the prosecutor's argument, the argument is filled with improper statements.[11] Considered in its entirety, the prosecutor's argument is obviously improper and prejudicial.

There is no evidence of any attempt by the prosecutor to cure his error. It is also clear that the defense counsel did not cure the prosecutor's error, either by objecting during the prosecutor's argument or by statements made by the defense counsel during his own penalty phase argument. As the district court stated, "defense counsel made no objections and failed to rebut the improper and misleading statements." *Id.* at 808.

With respect to curing the error by jury instruction, the trial judge made no comment *sua sponte* to the jury and issued no curative instruction after the closing argument was completed. The State's argument that the standard jury instruction that statements made by counsel during opening and closing argument are not evidence cures any error made by the prosecutor is without merit. Such a broadly sweeping rule would permit *any* closing argument, no matter how egregious.

■ Because we find that the prosecutor's closing argument improper, and because we agree with the district court that

---

**10.** The State suggested, at oral argument, that if a court finds one of the prosecutor's sentences to be erroneous, then it should measure what type of prejudice arose from the prosecutor's argument. Then it should examine what the defense counsel did in his argument to minimize the prejudice. Then it should review the jury instructions to see if the jury was properly instructed in the case, and then take into account all the aggravating and mitigating information to determine whether there is a reason-

able probability that the outcome of the sentencing phase would have been different. We agree with this method of analysis articulated by the State. Our review of the entire sentencing proceeding leads us to conclude that the prosecutor's penalty phase argument did indeed prejudice Newlon.

**11.** The prosecutor's argument is reproduced in its entirety as an appendix to this opinion.

impropriety was not cured by the prosecutor, the defense attorney or the court, we must examine the totality of the circumstances to determine whether there is a reasonable probability that error complained of affected the outcome of the penalty phase. *See Hamilton,* 809 F.2d at 470.

In contending that there was no prejudice, the State argues that the overwhelming evidence of Newlon's guilt should satisfy any further inquiry necessary to evaluate the degree of prejudice. The State cites *Brooks v. Kemp* in support of this proposition. In *Brooks,* the defendant admitted to rape, armed robbery, kidnapping and murder, and was convicted of all of those charges. The murder was preceded by both physical and psychological abuse, and the victim was left to slowly bleed to death at the side of the road. Most importantly, there was no doubt but that the petitioner in *Brooks* actually committed the murder. In *Newlon,* however, the jury never expressly found that Newlon fired the shot that killed Mansfield Dave. The jury deliberated for eight hours before arriving at a guilty verdict. The jury was instructed at the guilt phase that it was not necessary to find that Newlon was the actual murderer before convicting him of capital murder. At the penalty phase of the trial, the jury had to evaluate the evidence as it pertained to the two possible aggravating circumstances: "whether the defendant murdered Mansfield Dave for the purpose of receiving money * * *" and "whether the murder of Mansfield Dave involved depravity of mind * * *." If the jury had believed that Newlon had murdered Dave, rather than simply "had the frame of mind that's consistent with pulling the trigger," it would have been a simple matter to find the existence of the first aggravating circumstance—but the jury acquitted him of that circumstance. The facts implicating Newlon are no more overwhelming than those in *Drake v. Kemp,* 762 F.2d 1449 (11th Cir.1985), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986):

> The state's case against Drake was made almost completely by [the] co-defendant * * * who was trying to deny his own involvement in the crime. * * * The jurors deliberated at length before finding Drake guilty, and the court's felony-murder and aiding and abetting instructions make it impossible to know how they viewed Drake's involvement in the murder itself.

762 F.2d at 1461. Drake's sentence was vacated by the Eleventh Circuit.

Considering the prosecutor's penalty argument in light of the totality of the circumstances, we find that Newlon was unfairly prejudiced by the prosecutor's improper argument. As the district court concluded, the prosecutor's argument:

> infect[ed] the penalty proceeding with an unfairness that violates due process. The remarks were neither isolated nor ambiguous * * *. By contrast, *the jury was subjected to a relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated to remove reason and responsibility from the sentencing process.* This constitutional error requires that the sentence of death be vacated.

693 F.Supp. at 808 (emphasis added).

### IV.

For the above reasons, we affirm the judgment of the district court.

### APPENDIX

### PROSECUTOR'S PENALTY PHASE ARGUMENT

Ladies and Gentlemen: this is going to be difficult for me, because I've never done this before. Before I actually comment to you what I think the punishment should be for Mr. Newlon—I would like to point out a few things in the Instructions:

The Judge in his Instructions is going to tell you that you have two choices and I'm sure you are all already aware of what those two choices are, and he's also going to tell you if you can't come to a unanimous decision, he then will impose sentence, which will be a life sentence without parole for 50 years. Now, I want you to understand that Judge Ruddy is required

by law to give you that Instruction. He's required by law to assess the punishment at life, if twelve people of St. Louis County can't decide. Now, that in no way is meant to indicate his Honor's personal feeling as to what the sentence should be. So, don't interpret that to mean that the Judge in this case feels Rayfield Newlon's punishment should be life, and not death. No one knows how he feels—you don't know, and it shouldn't matter to you, but just so you don't misunderstand the Instructions, Judge Ruddy is required by law if you people don't say death, then it's automatically life. I hope you understand that.

Now, you will be given some more instructions. This is an unusual procedure, but when I'm finished discussing this with you, you will be given some more instructions, and they'll talk about "aggravating circumstances" and "mitigating circumstances." By law, you must find at least one aggravating circumstance and you are given lots of choices before you can assess the death penalty—but you must find one aggravating circumstance exists and you must be convinced beyond a reasonable doubt. You shouldn't have any trouble with that, because the two (2) aggravating circumstances listed are one, "whether the defendant murdered Mansfield Dave for the purpose of receiving money or any other thing of monetary value ..." and, of course, he did, and under the law that is considered an aggravating circumstance, and two, "whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman." There's no question about that. If it weren't for that second shot, you could see where reasonable people could differ and say the first shot may have been the result of panic, or maybe as a result of Mansfield Dave's alarm going off, or maybe that he reached for his gun or maybe something happened and the person panicked, resulting in a horrible death—but, I won't take his life for it, but in this particular instance more than one shot was fired and in order to fire that second shot a new shell had to be put in and the other taken out, and a fresh one put in—so, the shotgun was broken; opened, and reloaded and re-aimed, and fired again. That is an execution—just plain and simple—an execution. So, I think you can find both aggravating circumstances and you need only find one. By law this simply means that you twelve citizens must find it aggravating—and I certainly hope you find the circumstances of this particular crime aggravating—to say the least.

I think those are the only comments to make on the law other than the fact that there must also be some mitigating circumstances and I think you ought to consider the contrast between aggravating circumstances, which I just discussed, and that you heard for one week—and mitigating circumstances that are listed: one, "whether the defendant was an accomplice in the murder of Mansfield Dave and whether his participation was relatively minor."

Now, not that it matters what role he played in this crime, but his role was definitely not minor ... and,

"Whether the defendant acted [under] extreme duress or substantial domination of another person."

I don't think there should be any question in your minds who the orchestrator was, and I want you to ask yourselves if he was acting under anyones control, or just doing what he wanted to do? That is, did he want to take money and was he willing to take a life to do it?

Three, "the age of the defendant at the time of the offense."

Well, I think he's twenty-four years old. Twenty-four going on about fifty. I submit to you that his chronological age is twenty-four but he's a lot older than that. Anybody who could commit this kind of crime is older than twenty-four.

Now, when I said initially, that this was a difficult thing for me—I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than Rayfield Newlon. By returning your verdict in this case,—and you people found him guilty of capital murder—that either means that you believe beyond a reasonable doubt that he pulled the trigger, or that he had the frame of mind that's consistent with pulling the trig-

ger, and I submit to you, that Rayfield Newlon did pull the trigger, and didn't pull it once, but pulled it twice—executed an innocent man in cold blood.

So, where do you go from there? I say to you that I never saw a man who deserved it more and I say that to you in complete sincerity, and it's my job, as I see it, to tell you that. This is the first time I've ever made this argument, and I'm kind of groping for words—which I'm sure appears obvious to you, but it's my job to get you people over that intellectual hump or obstacle, that killing is bad, because killing is not always bad. Killing in self-defense is not bad; killing in war is not bad; taking Rayfield Newlon's life is not bad. It is not always bad to kill, but the fashion in which he did it, was wrong, and I hope to convince you that if you do it, it is right. Not only is one part of your difficult job over, and I'm sure your verdict was a difficult job for you people, and I don't want you to look back, because you did the right thing on the evidence and testimony; you did the right thing and don't look back. You found him guilty of capital murder, and now you only have to ask yourselves: does he deserve to live or die? I submit to you that he deserves to die. He doesn't deserve to breathe the same air that Mrs. Dave breathes. She's a widow with a son, and he's a son with no father. He doesn't deserve to breathe the same air. You saw Mrs. Dave on the witness stand and she has to live with this the rest of her life—every night she goes to bed she has to wonder where her husband is—if you're Christian and I don't know if you all are, but that woman has to literally wonder where he is.

Before you can take Rayfield Newlon's life, you have to give him a lawyer and a fair trial—he's entitled to that, and he got an excellent lawyer and a fair trial and twelve fair citizens. Now, if you say he deserves the death penalty, under the law, Judge Ruddy must review it and if he agrees, then his decision is reviewed by the Supreme Court—which is only appropriate and fair under the circumstances. But, did Mansfield Dave have his day in Court? If Rayfield Newlon is killed he'll know his appointed hour and have an opportunity to get his soul straightened out, and in a condition to meet his Maker. I'm not saying this lightly, or for dramatic effects—not at all. How do we know if Mr. Dave was prepared to meet his Maker, or what condition his soul was in before he was blown away. Do you think he gives a damn? He didn't care—that's why I say Mrs. Dave wonders where her husband is—literally, where his soul is?

Now, if you think that's dramatic, then ignore those portions you think are, for those reasons, but I hope you won't think that. I'm telling you, that Rayfield Newlon deserves to die, not only for what he did, but I think it's absolutely critical to say to him and others like him, ... that you have got to stop killing. You've got to stop robbing, and if you do this in St. Louis County you're going to pay the price. You people have got the opportunity here to send out this message, and to send it out all over St. Louis County—your own community—and Kinloch is a part of your community—this could have happened in Ladue, Lemay, Florissant, or Ferguson—these kinds of crimes happen every day and go on happening, and you've got the opportunity to say that Rayfield Newlon's in this area, if you're going to do your killing and keep on doing it—don't do it in our community, because if you do, we're going to kill you because we got the right to do it; it's fair and appropriate and it's right—not cruel and not unusual punishment—it's right. Did Mr. Newlon show any remorse in the video tape? No. Did he show any remorse on the witness stand? No. Did he show any reaction or emotion when the verdict was returned last night? You look at him? No. He knew what was coming; he knew that what he did would send him to prison—that's no big deal—he's been there before, and what assurances do you have that he'll be there fifty years? The legislature could change the law. All it says is no parole. It doesn't say it can't be commuted. There's no assurance of that at all. The law could be changed, but at least with death there is some assurance he won't commit any more crimes and the message is loud and clear, and perhaps others will think twice before they commit a robbery and take a life just for money. What I'm saying to you is if you come back with a

life sentence without him being eligible for parole for fifty years—that that won't get any reaction, and that's what he's expecting you to come back with—that's no big deal, going to prison, but maybe you'll get his attention if you come back with ... "we sentence you to death." As sure as he sits there, he doesn't think you have the guts to do it. Do you know how many people are on death row in this State? None. We've got the death penalty, but how many are there? None. Mr. Newlon will be the first one, if you put him on death row. Let others like him note that we're serious about it, and we've had enough ... if you're going to go in confectionaries and kill our proprietors in cold blood—unprovoked and unjustified; in cold blood—then, you're forfeiting your life.

You twelve people told me on voir dire when you were selected, you wouldn't rule out the death penalty—and I think three people excused themselves and said, "if I were to find somebody guilty of capital murder, I wouldn't even consider anything but the death penalty." Now, that surprised me. Three people said that and perhaps they're right—the more I reflect on it, but the law gives you two alternatives. But, if somebody is guilty of capital murder the ultimate crime, why should they get anything other than death? Why should they deserve to live,—even in some prison? Why should they be allowed to breathe the same air as the victims family, and that the rest of us breathe; why should they go on living? This crime didn't change his routine. After all of this was over, and the robbery was done, he went back and went to sleep; went to work the next day—whatever kind of job he has— tearing down houses, but he was no more afraid of killing than he is now of getting the death penalty. He doesn't think you'll do it, and I don't know if you'll do it either. I know you should. I'm asking you to do it.

I've got some notes here, I made early this morning. I sat by myself and thought for a long time about what I was going to say to you, and I don't want to miss some of the points I wrote down. I think they're important.

Rayfield was literally on a death mission. Rayfield sawed off the shotgun; he and Walter discussed they had to do this in the neighborhood, because they didn't have a car, and then Franz Williams had them a car, but they still didn't leave the neighborhood. Why? Because Rayfield Newlon was perfectly happy to take a human life— he didn't go to an area where they were not known, or wear a disguise or a mask or anything—no, and why not? Because Rayfield Newlon had no intention of leaving that store with Mansfield Dave alive. When he went in there, he went in with the intent of getting some money and to kill Mr. Dave. He was on a death mission and for all his effort, that's what he deserves: death. He killed in a totally unjustifiable fashion, and now it is your right to kill him, and I say to you to kill him, because it's not bad to kill him in this circumstance—not only, not bad, it's right.

Now, I'd like to talk about accomplishing a specific deterrent, and sending that message out. Now, there are questions on whether it deters or not, but let me say this to you: if it doesn't deter crime by taking Mr. Newlon's life, and it doesn't deter anyone else out in the community—what harm has been done? All you have done is take a life of a convicted murderer. That's all that you have done. The man deserves to die, and you've given him what he deserves, but, if it does deter, and the message rings out loud and clear, then it saves countless victims, and think perhaps how many people you'll save from this kind of slaughter, if it does deter. At the very worst, if it doesn't, you have simply given Rayfield what he deserves and that's an "eye for an eye and a tooth for a tooth" and that's what, I submit, this is all about, and I submit to you, that there is nothing wrong with that. You're not sitting in moral judgment of Rayfield—that's for God to do, when he and God meet, they can discuss that,—you're sitting in legal judgment now. If you give the death penalty, you'll have no trouble sleeping the rest of your lives. You'll know you did the right thing and you'll know every morning when you read about rapes and murders in the newspapers that you, at least did the right thing when you were called upon, and

when you were called upon to stand up and be counted—that you, were there.

You know—when I talk about sending out a message—well, I know the Charles Mansons wouldn't hear the message, or the Richard Specks or the "sons of Sam"—those kinds of people wouldn't hear it because those people are insane—legally responsible for what they did, but they wouldn't get this kind of message, and in the same—a truer fashion, he's not insane. This was simply a business venture—you know, he didn't hear any strange voices speaking to him, he just wanted some money, and all that stood between him and the money, was Mansfield Dave, and he eliminated—executed him. So Rayfield will hear the message and it's absolutely imperative that you come back with a death penalty. I can't tell you how important it is—no, not for me—I'm an elected Prosecuting Attorney, so it doesn't matter to me with regard to my office—and I would hope that you would give me enough credit to know that I wouldn't stand before you trying this case, because the stakes are high, but I'm telling you it's important because it's time St. Louis County said: "we're not going to tolerate any more killing—if you do this in our county, and in our neighborhoods, and in our community, you will pay the price, and we're not going to let you off with a light imprisonment, where you'll spend the rest of your days watching T.V. and in the recreation room and visiting the store ..." And, I'm not suggesting it's a pleasant life—it's a miserable one; horrible, and I wouldn't want to be in a prison—in fact, some people would probably rather be dead, but what I'm saying to you, is that the death penalty is what is right and fitting for Rayfield Newlon.

If Rayfield was going to harm your child, would you kill him? Would you have prevented this killing if you'd been in the Conveniency store with a gun, and you could have saved Mr. Dave's life? Would you have killed Rayfield? I think you would have—at least, I hope you would have had the courage to do either one of those. If you think you would have, kill him now. Kill him now. Once again, I hope you have the courage to do that, because it's tough.

I really don't have much more to say, but I hope to impress upon you that this is truly a war—I mean, a "street war" and it's justifiable to kill in a war. You know there are enemies—there's no question about it, Rayfield and others like him are the enemy and it's still going to go on, and on, and on, unless you citizens of St. Louis County say it's not going to go on, and we may have to catch you and convict you, but when we do, we're going to execute you, and at least those people won't go and do it.

When I talked to you yesterday, as the trial lawyer in the case, I was trying to convince you—if I should use the word convince, but that he was guilty of capital murder, because that's what he's guilty of, and I convinced you of that. Perhaps there was evidence and remarks in closing arguments that persuaded you to that end, or maybe in spite of my efforts—but in any event, you came back with capital murder. Today I'm talking to you as Prosecuting Attorney of this County—the top law enforcement officer in St. Louis County. I represent the people of the State of Missouri in St. Louis County and on behalf of Mrs. Dave and others like her, and her son, who no longer has a father, and for Mr. Dave—and all we've seen of him is in a pool of blood on a confectionary floor—for all of them, I'm asking you for the death penalty.