# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-2456

_____

| | | |
|---|---|---|
| Daryl Shurn, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeals from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Missouri. |
| | * | |
| Paul Delo, Superintendent, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: January 12, 1999

Filed: May 10, 1999

_____

Before RICHARD S. ARNOLD, BRIGHT, and WOLLMAN, Circuit Judges.

_____

BRIGHT, Circuit Judge.

A jury convicted Daryl Shurn of first-degree murder for his participation in the shooting death of Charles Taylor. The trial court sentenced Shurn to death after the jury failed to agree on punishment. Shurn appeals the denial of his petition for a writ of habeas corpus.[1] 28 U.S.C. § 2254 (1999). He challenges his conviction and

_____

[1]The Hon. Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

sentence. We affirm the conviction but vacate the death sentence. We remand with instructions that the district court issue a writ of habeas corpus releasing Shurn from the sentence and ordering the State of Missouri either to sentence Shurn to life imprisonment without eligibility for probation or parole or to grant Shurn a new penalty-phase trial.

## I.    STATEMENT OF FACTS

The Missouri Supreme Court briefly summarized the facts as follows:

> On July 6, 1987, Shurn and Weaver parked an Oldsmobile '98 outside of Taylor's apartment complex. After a confrontation at Taylor's door, Shurn and Weaver chased him behind the complex, and Taylor was shot. The evidence was unclear whether Shurn, Weaver, or both shot Taylor. Shurn and Weaver then returned to the car. Weaver then left the car and again went behind the complex. More shots were fired. Weaver returned to the car, and Shurn and Weaver drove away. After a chase, police officers apprehended Shurn and Weaver.

State v. Shurn, 866 S.W. 2d 447, 455 (Mo. 1993) (en banc).

The state charged Shurn with first-degree murder and first-degree armed criminal action in violation of Mo. Rev. Stat. § 565.020.1 and Mo. Rev. Stat. § 571.015. At Shurn's trial, the state presented evidence that Taylor stood as a probable witness in the pending drug trial of Shurn's brother. The state admitted it could not prove that Shurn shot Taylor.

The jury found Shurn guilty of both charges on March 26, 1988. At the penalty phase, the court instructed the jury to consider as aggravating circumstances whether Taylor's murder involved "depravity of mind" and whether Taylor "was killed as a result of his status as a potential witness." The court instructed the jury to consider as

mitigating circumstances whether Shurn had no significant history of prior criminal activity, whether Shurn acted as an accomplice and not the triggerman, and that Shurn had five children and was a devoted family man. The jury returned a verdict stating it was "unable to decide or agree on punishment." The trial court sentenced Shurn to death after finding that Taylor was killed as a result of his status as a witness.

The Missouri Supreme Court affirmed Shurn's conviction, sentence, and denial of post-conviction relief. Shurn, 866 S.W.2d at 473. Shurn filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Missouri on December 16, 1994. The court denied the petition on August 25, 1997. This court granted a certificate of appealability on May 25, 1998. This appeal followed.

## II.    THE ISSUES ON APPEAL

Shurn raises five issues on appeal:

1.    Whether the prosecutor's penalty-phase closing argument violated due process;
2.    Whether the death sentence violated the Eighth Amendment requirement of individualized sentencing in that the trial court failed to make a particularized finding of Shurn's motive or mental state;
3.    Whether trial counsel's failure to prepare constituted ineffective assistance of counsel at sentencing;
4.    Whether the prosecutor violated Batson v. Kentucky, 476 U.S. 79 (1986), by racially discriminating in the use of peremptory strikes to exclude blacks from the jury; and
5.    Whether the Missouri Supreme Court gave the death sentence meaningful proportionality review.

We affirm the denial of Shurn's Batson claim. The record adequately supports the trial court's determination that the prosecutor gave valid, race-neutral explanations

for using peremptory strikes to exclude four blacks from the jury. As the Batson claim provides the only grounds for challenging the conviction, we affirm the conviction. However, we also hold that the prosecutor's penalty-phase closing argument violated due process. This requires us to vacate the death sentence. Our ruling on the argument makes it unnecessary to reach the remaining issues, all of which pertain to the validity of the sentence.

## III.    THE BATSON CLAIM

We first address Shurn's Batson claim, as a Batson violation would require a new trial. Batson held that a state may not use peremptory challenges to exclude individuals from serving on a jury because of their race. Batson v. Kentucky, 476 U.S. 79 (1986). The Missouri Supreme Court described the relevant portion of the voir dire as follows:

> After strikes for cause, the panel consisted of 48 potential jurors, including six blacks. The prosecutor peremptorily excluded four of the blacks: venirepersons Grider, Lenox, Webster, and Hughes. Shurn then made a timely Batson objection.
>
> . . . .
>
> The prosecutor explained: (1) that he struck venireperson Grider because she was a schoolteacher, was married to a pastor, and had earlier asked to be removed from the panel; (2) that he struck venireperson Lenox because she indicated she was reluctant to impose the death penalty unless the state proved that Shurn--and not his accomplice William Weaver--was the shooter, and he had requested the court to strike her for cause; (3) that he struck venireperson Webster because she "waffled" on whether she could impose the death penalty unless Shurn was the shooter, and seemed uninterested during voir dire; and (4) that he struck venireperson Hughes because she remarked, "we're not God," did not seem truthful, and showed hostility towards the state's case by nodding when another venireperson raised the issue of race.

Shurn, 866 S.W.2d at 456.

-4-

We view the Batson issue as a close one. Shurn has indicated facts that could support a finding of racial discrimination in the use of peremptory challenges. However, the state trial court and the district court agreed that the prosecutor gave valid, race-neutral reasons for excluding the black jurors. We cannot say that the trial court clearly erred in finding that the prosecutor lacked discriminatory motivation. A prosecutor's motive in excluding jurors presents a question of fact. See Gibson v. Bowersox, 78 F.3d 372, 374 (8th Cir. 1996). In habeas proceedings, we presume the correctness of state court findings of fact, and we may set them aside, absent procedural error, only if they lack adequate support in the record. See Purkett v. Elem, 514 U.S. 765, 769 (1995). The record adequately supports the trial court's findings regarding the prosecutor's motives. The prosecutor excluded five non-blacks and left two blacks on the jury. He excluded non-black jurors exhibiting the characteristics used to justify striking the black jurors. The transcript supports most of the explanations given for the strikes. Accordingly, we affirm the denial of Shurn's Batson claim.

## IV.    THE PROSECUTOR'S CLOSING ARGUMENT

We turn now to Shurn's claim that the prosecutor's penalty-phase closing argument violated due process. This requires us to determine whether Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989), controls the disposition of the case. In Newlon, this court determined that the prosecutor's improper penalty-phase closing argument violated due process and required reversal of the death sentence. To facilitate the analysis we now set forth the relevant portions of the arguments in each case as follows:

Closing Argument in Newlon

At the very worst, if it doesn't [deter], you have simply given Rayfield what he

Closing Argument at Shurn's Trial

I'm asking you to take an eye for an eye. The Old Testament--that still applies

-5-

deserves and that's an "eye for an eye and a tooth for a tooth."

You know–when I talk about sending out a message-well, I know the Charles Mansons wouldn't hear the message, or the Richard Specks or the "sons of Sam"-those kinds of people wouldn't hear it because those people are insane-legally responsible for what they did, but they wouldn't get this kind of message, and in the same-a truer fashion, he's not insane. This was simply a business venture-you know, he didn't hear any strange voices speaking to him, he just wanted some money, ...

Killing in self-defense is not bad; killing in war is not bad; taking Rayfield Newlon's life is not bad.

If Rayfield was going to harm your child, would you kill him? Would you have prevented this killing if you'd been in the Conveniency store with a gun, and you could have saved Mr. Dave's life? Would you have killed Rayfield? I think you would have-at least, I hope you would have had the courage to do either one of those. If you think you would have, kill him now. Kill him now.

today. There are times it's appropriate in my opinion. This is one of them.

Passion killings you're never going to deter. The Charles Mansons of the world, you're not going to deter them. They are crazy. Charles Manson was nuts. He deserves to spend the rest of his life in prison. Some of you wouldn't want to kill him, nonetheless, because he's a sick, sick person. But he would not hesitate to kill. I would give him the death penalty, but I can see where some people wouldn't. But certain people, their crimes are so deviant that you say we'll just put you away. But this was a business decision. This is the kind of crime that can be deterred.

You know, it's not always wrong to kill. It's maybe always difficult to kill; but if you kill in self-defense, that's not wrong. If you kill in a just war, that is not wrong. It's right. If somebody is going to kill your child and you have a chance to kill them to prevent it, would you do it? Of course. Kill Daryl Shurn.

I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than Rayfield Newlon.

Today I'm talking to you as Prosecuting Attorney of this County-the top law enforcement officer in St. Louis County.

Id., at 1339-42.

I'm the top law enforcement officer in this county and I'm the one that decides in which cases to ask for the death penalty and which cases we won't. You people have to tell me: Is this an appropriate case or isn't it? You're the community. You represent society. You represent all those potential witnesses out there that have the courage to come forward. You have to tell me: Is this a case where I should ask for the death penalty or am I wasting my time? You're the community.

I'm telling you there's no case that could be more obvious than Daryl Shurn's and William Weaver's was.

Tr. Vol. III at 1165-66, 1168, 1171-72.

In Newlon the district court determined that the argument improperly "(1) expressed [the prosecutor's] personal belief in the propriety of the death sentence and implied that he had special knowledge outside the record; (2) emphasized [the prosecutor's] position of authority as prosecuting attorney of St. Louis County; (3) attempted to link [the defendant] with several well-known mass murderers; (4) appealed to the jurors' personal fears and emotions; and (5) asked the jurors to 'kill him now. Kill him now.'" Newlon, 885 F.2d at 1335. As we observed, the district court held that the argument

> infected the penalty proceeding with an unfairness that violates due process. The remarks were neither isolated nor ambiguous. . . . By contrast, the jury was subjected to a relentless, focused, uncorrected argument based on fear, premised on facts not in evidence, and calculated

-7-

to remove reason and responsibility from the sentencing process. This constitutional error requires that the sentence of death be vacated.

Id. at 1338.

We approved of the district court's ruling. We determined that the argument was "filled with improper statements" and that, considered in its entirety, the argument was "obviously improper and prejudicial." Id. at 1337. We held that the argument violated due process and affirmed the reversal of the death sentence. Id. at 1336 n. 9.

At Shurn's trial, the same prosecutor gave essentially the same argument that required reversal of the death sentence in Newlon. The district court attempted to distinguish the arguments, but we view them as indistinguishable. The prosecutor emphasized his position of authority and expressed his personal opinion on the propriety of the death sentence. He attempted to link Shurn with Charles Manson, a well-known mass murderer. He appealed to the jurors' fears and emotions and told them to kill Shurn. The arguments differed slightly in degree but not in emphasis. As in Newlon, the prosecutor's argument was "filled with improper statements" and was "obviously improper and prejudicial." The similarity of the arguments renders Newlon dispositive.

Though improper, the argument does not require reversal of the sentence unless it amounted to prejudicial error. This requires determining whether a reasonable probability exists that the error affected the outcome of the penalty phase. Id., at 1338. In our view, the argument amounted to prejudicial error. The state did not prove that Shurn did the shooting. The jury disagreed on punishment. Consequently, we must assume it likely that the jury would have sentenced Shurn to life imprisonment rather than death if not exposed to the improper argument.

We hold that the prosecutor's penalty-phase closing argument violated due process and requires reversal of the death sentence. In Missouri, first degree murder

carries a punishment of death or life imprisonment without eligibility for probation or parole. Mo. Rev. Stat. § 565.020(2). We therefore remand with instructions for the district court to issue a writ of habeas corpus releasing Shurn from the death sentence and ordering the State of Missouri either to sentence Shurn to life imprisonment without eligibility for probation or parole or to grant Shurn a new penalty-phase trial.

## V.   CONCLUSION

In summary, we affirm Shurn's conviction for first-degree murder. The record adequately supports the trial court's determination that the prosecutor gave valid, race-neutral reasons for excluding four blacks from the jury. However, we vacate the death sentence for the reason that the prosecutor's improper penalty-phase closing argument violated due process.

WOLLMAN, Circuit Judge, concurring.

I concur fully in the court's holding on the Batson issue. I also concur in the holding that the prosecutor's penalty-phase closing argument requires us to set aside the death sentence. I write separately only to express my view why the closing argument went beyond the bounds of constitutionally permitted advocacy.

We concluded our opinion in Newlon by finding that Newlon had been unfairly prejudiced by the prosecutor's improper argument because, among other things, the argument was "'calculated to remove reason and responsibility from the sentencing process.'" Newlon, 885 F.2d at 1338 (quoting Newlon v. Armontrout, 693 F. Supp. 799, 808 (W.D. Mo. 1988)). What I find beyond the pale in Newlon is that portion of the closing argument in which the prosecutor stated:

> If Rayfield [Newlon] was going to harm your child, would you kill
> him?  Would you have prevented this killing if you'd been in the

> Conveniency store with a gun, and you could have saved Mr. Dave's life? Would you have killed Rayfield? I think you would have--at least, I hope you would have had the courage to do either one of those. If you think you would have, kill him now. Kill him now.

Newlon, 885 F.2d at 1342.

So also with respect to that portion of the closing argument in the present case in which the prosecutor said,

> You know, it's not always wrong to kill. It's maybe always difficult to kill; but if you kill in self-defense, that's not wrong. If you kill in a just war, that is not wrong. It's right. If somebody is going to kill your child and you have a chance to kill them to prevent it, would you do it? Of course. Kill Daryl Shurn.

To me, the statements "[K]ill him now. Kill him now," and "Kill Daryl Shurn," are an appeal to blood lust and mob justice rather than a call for the jury to return a sentence of death after calm, reasoned deliberation. This strident appeal to primitive emotion could not have done other than to touch the raw nerve of vengeance that lies within us all. The resulting "diminution of the jury's sense of responsibility undermine[d] the Eighth Amendment's heightened need for 'the responsible and reliable exercise of sentencing discretion' in capital cases." Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir. 1985) (quoting Caldwell v. Mississippi, 472 U.S. 320, 329 (1985)).

This is not to say that a prosecutor should not argue for a death sentence with passion and conviction, for if the death penalty is to serve any valid purpose it should be sought and imposed in those cases in which the citizens of a state have determined that there are certain crimes the nature of which call for no lesser penalty. For those to whom the death penalty in all circumstances represents a barbaric, unconstitutional

punishment, no doubt it is a contradiction in terms to say that a jury can impose it in a rational, deliberative manner. Yet that is what the constitution requires, which is why juries are required to weigh the inhumanity of the defendant's deeds against the defendant's humanness. The call to "Kill him. Kill him now," diverts the jury from its solemn duty of making that calculation, for it is an appeal to base emotion rather than to the higher instinct of moral indignation, which, ultimately, is the foundation upon which the criminal law is based.

There recently appeared a thoughtful column on the subject of capital punishment, which says in part:

> Can capital punishment possibly be civilizing? Might it be sometimes indispensable? Human nature, without a social contract, leads people to pursue and punish murderers in their own way. The social contract restrains man's impulse toward rough justice. The contract states: Our authorities, acting under law for the community, will find the killers, try them and punish them. Implicit is the promise that the punishment will be sufficient to satisfy the need not only for moral satisfaction and justice but also for some measure of emotional satisfaction, a catharsis by -- to admit it -- legally ritualized revenge. A public hanging used to be a celebration of justice. The catharsis may have barbaric roots, yet by paradox is an essential civilizing instrument.

Lance Morrow, "Something We Cannot Accept," <u>TIME</u>, March 8, 1999, at 92.

If indeed the imposition of the death penalty is a form of "legally ritualized revenge," then, to be constitutionally acceptable, that revenge -- societal retribution, really -- must be the result of reasoned deliberation and the exercise of moral judgment, rather than the product of a visceral response to the most primitive of emotions.

-11-

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT