# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1098EM

_____

|  |  |  |
|---|---|---|
| Marlin Gray, | * | |
| | * | |
| Appellant, | * | |
| | * | On Appeal from the United |
| v. | * | States District Court for |
| | * | the Eastern District of |
| | * | Missouri. |
| Michael Bowersox, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted: December 13, 2001

Filed: February 26, 2002

_____

Before LOKEN, RICHARD S. ARNOLD, and BYE, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.


This is a death-penalty case in which the convicted defendant challenges his conviction and sentence by petition for writ of habeas corpus under 28 U.S.C. § 2254. The defendant, Marlin Gray, has been convicted and sentenced to death in connection with the murder of two sisters, Julie and Robin Kerry, in 1991. The District Court[1]

_____

[1]The Hon. Carol E. Jackson, United States District Judge for the Eastern District of Missouri.

denied relief in a thorough opinion. This appeal is before us on four issues: three having to do with alleged improprieties in the prosecution's penalty-phase closing argument to the jury, and one ground claiming ineffective assistance of counsel in not objecting to certain general instructions given to the jury panel during voir dire.[2]

We affirm the judgment of the District Court. With respect to the penalty-phase closing argument, we hold that some of the alleged improprieties were cured by rulings of the state trial court, and that two other arguments were either not improper or not prejudicial to the defendant in any material way. As to the comments of the state trial court to the jury panel during voir dire, we hold that ineffective assistance of counsel in failing to object has not been made out. Some of the comments were proper, so an objection, even if it had been made, would have been properly overruled. As to other parts of the comments, there is no reasonable probability, in our view, that they affected the outcome of this case, and therefore defendant cannot show the requisite prejudice.

I.

Petitioner did not kill Julie and Robin Kerry himself. Instead, according to the state and the verdict of the jury, he participated in a major way with three other men, Reginald (Reggie) Clemons, Antonio (Tony) Richardson, and Daniel Winfrey, in robbing the two victims and their cousin, Thomas Cummins, and in raping the two women. Under Missouri law, a person may be guilty of first-degree murder (and therefore eligible for the death penalty) without being the actual killer. Participation in the planning and execution of felonies, here rape and robbery, however, is not sufficient in and of itself. It must also be shown that defendant's associates committed murder, that defendant cooperated with them, and that defendant, after

---

[2]This Court granted a certificate of appealability on these four issues by order entered February 6, 2001.

deliberation, acted with them to cause the deaths. Deliberation means cool reflection for any length of time, no matter how brief. Mo. Rev. Stat. § 565.002(3) (1986) (the version of the statute in effect at the time of these crimes). There must be some evidence that the defendant himself made a decision to kill the victims before the murder. State v. O'Brien, 857 S.W.2d 212, 218 (Mo. 1993) (en banc). The sufficiency of the evidence to establish Gray's guilt of first-degree murder is not one of the issues before us. Nonetheless, we briefly summarize the facts, both in order to give the reader the background of the case, and because the strength or weakness of the state's evidence is material to the question of prejudice. In doing so, we draw mainly on the opinion of the Supreme Court of Missouri affirming the conviction and sentence. State v. Gray, 887 S.W.2d 369 (Mo. 1994) (en banc), cert. denied, 514 U.S. 1042 (1995).

The crimes occurred on the night of April 4-5, 1991, on the Chain of Rocks Bridge over the Mississippi River at St. Louis, Missouri. The bridge had been abandoned for some time. It was a popular party spot for teenagers and young adults. The two victims, Julie Kerry, age 20, and her sister Robin Kerry, age 19, met their cousin, Thomas Cummins, also 19, shortly before midnight, and took him to the bridge. They wanted to show him a graffiti poem they had previously painted on the bridge deck. When they got to the bridge, the Kerry sisters and Cummins met Gray, Winfrey, Clemons, and Richardson. Richardson and Winfrey were 16 and 15 years old respectively. Gray was the oldest and largest of the group.

After some conversation, the two groups separated, the Kerrys and Cummins walking east, towards Illinois, and Gray's group walking west, towards Missouri. During this walk, Clemons suggested to his three companions that they rob Cummins and the Kerrys. Gray smiled, clapped his hands, and said, "Yeah, I feel like hurting somebody." They began walking back towards the Kerry group. During the walk, Gray and Clemons had a conversation. Gray then handed Winfrey a condom, and Winfrey said he "wasn't going to do anything." Gray and Clemons pushed Winfrey

against the railing of the bridge and said, "You're gonna do it." Winfrey then agreed to "do it."

The two groups met. Gray put his arm around Cummins and walked him ten to fifteen feet away. He told him, "This is a robbery. Get down on the ground." Gray told Cummins that if he looked up, Gray would kill or shoot him. At the same time, the other three confederates grabbed the two women, who screamed. One of the men said, "[D]o you want to die?" and ordered the girls to stop screaming or the speaker would "throw you off this bridge." It is a fair inference that defendant heard these statements, if he did not make them himself.

Clemons then raped Julie Kerry. Richardson held her. Richardson raped Robin Kerry. At some point, while these rapes were occurring, defendant went back to where Cummins was lying on the ground and said, "I've never had the privilege of popping somebody. . . . [I]f you put your head up or try to look, I'm going to pop you." Gray then told Winfrey to watch Cummins. Gray, with the assistance of Clemons, then raped Robin Kerry. While this rape was occurring, Richardson forced Julie Kerry into a manhole on the bridge deck. The manhole led to a metal platform and a concrete pier that supported the bridge. Gray had earlier shown this location to his three associates and to the Kerry group. When he had finished raping Robin, Gray went to Winfrey and asked where Richardson had gone. Winfrey pointed to the Missouri side of the river, and defendant ran off in that direction. Clemons then forced Robin Kerry and Cummins into the manhole and told Winfrey to find Gray. Julie and Robin were then pushed into the river, a distance of fifty to seventy feet. They were killed. Cummins was told to jump, and he did. He survived to testify at Gray's trial. Meanwhile, Winfrey had found Gray, and they were returning back to the bridge. Clemons and Richardson met them. Clemons said, "We threw them off. Let's go." The group then left the bridge. Clemons said, "They'll never make it to shore." Gray praised Richardson for being "brave" to push the Kerry sisters off the bridge.

Gray himself did not do the killing or directly participate in it. He did, however, participate in the planning of the robbery and the planning and execution of the rape. He twice threatened to kill Cummins, which shows murderous intent. He continued in the criminal enterprise. He knew that the women had been threatened with death. He complimented his friends on the killings after they had occurred. There is ample evidence here of participation and deliberation to justify a verdict of guilty on charges of first-degree murder.

## II.

We address first petitioner's contentions with respect to the voir dire, because these arguments, if upheld, would result in vacation of the conviction as well as the sentence, and require a complete new trial. Petitioner claims that his lawyer was ineffective in not objecting to certain comments made by the state trial court during the voir dire of the jury panel. The voir dire was conducted in panels of twelve or more. The following statements are representative of those to which petitioner says his trial lawyer (not counsel presently representing him) should have objected:

> The next thing I want to talk about is another legal principle and that's called, that's a little bit different. You may not have heard of this one before. It's not as common as the first. It's something that is called acting with another. That is when you have more than one individual involved in an alleged crime and you charge all, the State charges all those people as acting with each other to commit the crime, okay.
>
> Let me give you two examples. Example number one, Tom and Joe are going to rob a bank. Tom is the driver. He pulls up in front of the bank. Joe gets out, goes into the bank, pulls a gun, takes the money, shoots the teller, gets back in the car that's running and they flee.

Both are equally responsible for the robbery and murder under the law. That's acting with another, the part he participated in. Now he wasn't just hanging out in front of the bank and just happened to see it. He was involved in the planning and implementation of this robbery and murder. That's what acting with another is.

Example number two, Tom and Joe are fighting with Harry in a fistfight. Tom's holding Harry and Joe's hitting him. Joe gets real upset, pulls out a knife, let's say, stabs him, he's dead, or pulls out a gun and shoots him or pulls a brick from the ground and hits him in the head. Harry dies.

Tom is holding Harry. Tom is just as guilty of murder in the first degree or could be just as guilty of murder in the first degree as Joe. That's what acting with another is. It means more than, hey, he just happened to be there. He has to be involved. He has to assist.

Tr. 621-22.

The purpose of these remarks was to explain to the jury the concept of accomplice liability — that someone other than the actual killer can, under certain circumstances specified by law, be guilty of first-degree murder and eligible for the death penalty. When read carefully, literally, and as a whole, the trial court's remarks, in our view, may have been a correct statement of Missouri law, as far as they went. The court did not, as petitioner now complains, tell the venire that anyone who participates in a felony, during the course of which someone else commits first-degree murder, is also guilty of the same crime. In the first example given by the court, the bank-robbery case, Tom, the non-shooter, is not merely the getaway man. "He was [also] involved in the planning and implementation of this robbery and murder." (Emphasis added.) In the second example, Tom, again the non-shooter, is holding the victim when his associate kills him. Tom is guilty of murder if he is "involved" and

-6-

"assist[ed]."  Or, at least, he "could be" guilty of murder under these circumstances.  On the other hand, there is no mention of the element of deliberation (though perhaps it is implicit), and, as the Supreme Court of Missouri remarked, a good deal more was said than needed to be.  The commentary "may conceivably [have led] to confusion."  State v. Gray, supra, 887 S.W.2d at 379.

Petitioner also cites the following discussion of the concept of reasonable doubt:

> It doesn't matter if it's a traffic ticket, if it's a traffic ticket and the most that can happen to you is you get fined ten bucks, or if you are charged with murder first-degree and the penalty is death.  So the proof beyond a reasonable doubt is what the standard of proof is in all criminal cases.
>
> The law does not require the State to prove a higher burden of proof simply because the punishment is more severe.  Does everybody understand that?  Is there anyone who disagrees with that?  No, okay.

Tr.  220-21.  The court also said:

> What reasonable doubt means to you is going to be different than what it means to me.  There's just no way we're going to be alike, but can you follow the law?  Is there anyone who cannot follow the law as it relates to beyond a reasonable doubt?  Okay.

Tr.  342-43.

Parts of these remarks are problematic.  It is true, in theory anyway, that the burden of proof is the same in all criminal cases.  On the other hand, the apparent

equation of a traffic ticket and the death penalty could have been taken to detract from the seriousness of a jury's decision with respect to life or death. Second, it is probably true that different people will apply the concept of reasonable doubt in different ways, or, at least, that different people may disagree about the result of its application. This does not mean, though, that the definition is different for different people. All jurors are obliged to take the definition as given by the court and apply it to the best of their individual abilities.

We can think of reasons why a prudent lawyer would not have wished to interrupt the judge with objections at these points in the proceedings. The remarks were objectionable in part, but not in their entirety. An objection might have led to the court's repeating certain parts of the remarks, giving them an emphasis that a prudent defense lawyer might have thought inopportune. In addition, a lawyer might not wish to begin a trial, even before a jury has been selected, by appearing combative. We are admonished not to use hindsight in judging the conduct of lawyers, especially in the heat of a trial. So we are not sure that what the lawyer failed to do here, though it fell short of perfection, amounted to ineffectiveness in the constitutional sense.

In any case, part of the petitioner's burden on an issue of this sort is to show prejudice, which is defined as the existence of some factor that undermines a reviewing court's confidence in the verdict. See Strickland v. Washington, 466 U.S. 668, 694 (1984). The remarks at issue here occurred at the very beginning of the trial, at a time when no individual knew that he or she would be on the jury. All of the evidence and all of the argument of counsel intervened before the jury began to deliberate. And most importantly, the instructions actually given by the court on the issues of accomplice liability and reasonable doubt were correct. We see no appreciable chance that the jurors actually selected would have been governed by some of the implications of the court's statements on voir dire, instead of by the instructions actually given. Accordingly, we hold that no prejudice in the Strickland

sense has been shown, and we reject this first argument urged by petitioner. We agree with the Supreme Court of Missouri that "the jury instructions submitted by the court on the concepts of reasonable doubt and accessory liability had the effect of correcting any potentially misleading statements that might have resulted from the voir dire." State v. Gray, supra, 887 S.W.2d at 379.

## III.

Petitioner's other arguments have to do with the penalty phase of the trial. If they were to succeed, they would not result in a setting aside of the conviction, but rather in a new penalty-phase proceeding.

## A.

First, petitioner objects to evidence introduced during the penalty phase with respect to certain of the victim's activities, including their "liberal" political views, their interest in social change, and their involvement in community activities. It was also improper, petitioner says, for the prosecutor to refer to this evidence during closing argument. We disagree. "Victim impact evidence" is not per se inadmissible under the Eighth Amendment. The prosecution is allowed to show the "specific harm caused by the defendant." Payne v. Tennessee, 501 U.S. 808, 825 (1991). It can show that the " 'victim is an individual whose death represents a unique loss to society and in particular to his family.' " Ibid., quoting Booth v. Maryland, 482 U.S. 496, 517 (1987) (White, J., dissenting), a case overruled by Payne. Victims' civic activities and involvement in the community are part of their lives, part of what has been lost on account of their death. Certainly it is true that the life of a "liberal" is worth no more than that of a "conservative," and it would be a violation of the First Amendment, if not of the Eighth, for a court or a jury to make such a distinction. The prosecution, however, must take the victims' lives as it finds them. The argument was not unduly emphasized, nor was the jury invited to impose the death penalty on

account of the political viewpoint espoused by the victims. Indeed, the argument might be regarded as a dangerous one for the prosecution, in that it conceivably could have offended members of the jury who disagreed with the victims' political activities. In any case, the argument was not unduly prejudicial and does not violate either the Eighth Amendment or the Due Process Clause of the Fourteenth.[3]

## B.

Next, objections are made to certain other passages in the prosecutor's closing argument in the penalty phase. The prosecutor made three references to the Charles Manson case. Objections were sustained to the first and third references, but no contemporaneous objection was made to the second one. We summarize what happened.

The prosecutor made the following statement:

> You know, I sat here, also, yesterday listening to his witnesses and I got this strange feeling that, you know, something was wrong here. Couldn't put my finger on it. I kept seeing the witnesses and seeing the witnesses. As I pointed out they're white, middle class, problem, not accepted at home for some reason or another, low self esteem. I said something's — and then I looked at, you know, I talked about this crime. And it struck me. Do you remember California? Do you remember the man that never went into the house?

---

[3]Petitioner also argues that he received ineffective assistance of trial counsel because counsel did not object to the evidence and argument in question. Whether such a claim is included within the certificate of appealability is debatable. In any event, because the underlying objection would have been without merit, a claim of ineffective assistance is not viable.

MS. HIRZY:  I'll object, your Honor, to any outside reference to any other case.

THE COURT:  I'll sustain the objection.

MS. HIRZY:  Ask the jury be instructed to disregard.

THE COURT:  I'll make that instruction.

MR. MOSS:  Can we approach the bench.

(At this time a bench conference was held.)

MR. MOSS:  There are no restrictions in here as long as I don't call him Hitler and I don't call him —

THE COURT:  What are you going to talk about?

MR. MOSS:  I'm going to talk about the Manson murders and how the manipulation occurred there.

MS. HIRZY:  There's been no evidence presented and you can't just bring in any facts.

MR. MOSS:  This is not an evidence matter.

THE COURT:  This is, look, your argument is going to be manipulation?

MR. MOSS: Manipulation of women and of weaker younger people who have problems that the guy that did that —

THE COURT:  You're not going to call this guy Manson, are you?

MR. MOSS:  No.

-11-

THE COURT:  I'll overrule the objection.

Tr. 2705-06.

The objection is that nothing about the Manson case had been put in evidence, and that referring to it was irrelevant to the individual blameworthiness of the defendant and likely to inflame the emotions of the jury.  We find the reference to the Manson case rather obscure.  We do not know how the jury understood it, nor are we sure that we ourselves would have made the connection.  In any case, the court, in the presence of the jury, sustained the objection and stated, after being asked to instruct the jury to disregard, "I'll make that instruction."  Although this statement, read literally, is in the future tense, we think the jury would have understood from the context that the court had ruled the prosecution's remarks improper, and that they were not to consider them.

The later colloquy among court and counsel, resulting in the statement "I'll overrule the objection," occurred at a bench conference, out of the presence of the jury.

The argument then continued:

> MR. MOSS:  Well, the names, you know, Charles "Tex" Watson came to me, Patricia Krenwinkle, Squeaky Fromme.  You know, those names came to me and I said, what the heck, you know, why did that jump into my mind and I couldn't understand it.  And then basically it came that people who are weaker, younger, problematic, can be manipulated and dealt with by somebody who is apparently stronger, who like their leader, you know, was a poet, played the guitar, fancied himself a songwriter, but really had a problem.

-12-

The point is here, what you've got to understand is that you don't need to be there as you told me when you push them off, not if you've done all the handiwork beforehand. You don't need, you don't need to be the last one that shoves them off and hears them screaming as they go down.

Tr. 2707.

No objection was made to this particular portion of the argument. Again, however, the reference to the Manson case is obscure. Manson's name was not mentioned. We have no idea whether the jury would have connected the names that were mentioned with Manson. The overall point, that someone can be lawfully subjected to the death penalty even if he is not "the . . . one that shoves them off and hears them screaming as they go down" is not at all an improper argument. We do not fault counsel for not objecting at this point. Assuming that the jury connected both the first and second passages we have quoted with the Manson case, and believed it was being invited to consider petitioner a person as evil as Charles Manson, the jury would also no doubt remember that it had just been told that a similar argument was objectionable, and should be disregarded. Counsel may have thought that the objection need not be repeated. In any case, we are not convinced that this particular reference affected the verdict in any appreciable way.

Finally, during the prosecution's penalty-phase rebuttal, the prosecutor made the following argument:

And that these ladies [referring to defense witnesses] would come in here and lie. Remember the case I was referring to in California. Do you remember the young ladies who were, of course, charged and the man, young man? But do you also remember the people that came

-13-

outside the courthouse and when he shaved his head they shaved their heads and sat individually —

MS. HIRZY: I'm going to object again to this, your Honor.

THE COURT: Objection is sustained. Proceed.

MS. HIRZY: Ask the jury to disregard.

THE COURT: The jury is ordered to disregard. Proceed.

Tr. 2719-20.

As in the case of the first passage complained of, the court told the jury, this time without even arguable equivocation, that the remarks were objectionable, and that the jury should disregard them (this time using the present tense). The court's action was unambiguous. The only thing further that could have been done was to order a mistrial, and we do not see this incident as approaching such a level of prejudice. The prosecutor was attempting, apparently, to draw some kind of parallel between Manson's coterie and the witnesses for the defendant. Maybe the jury understood this attempted inference, but, if it did, it was promptly instructed to disregard it. We routinely assume that juries follow the court's instructions.[4]

We add a word with respect to the underlying merits of petitioner's arguments. He cites, among other cases, Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989),

---

[4]Again, an ineffective-assistance argument is made. Assuming that it falls within the scope of the certificate of appealability, we reject it. Those arguments to which counsel failed to object, in our view, had no appreciable effect on the outcome of this case.

-14-

cert. denied, 497 U.S. 1038 (1990). We think the argument in Newlon was much more egregious. The Supreme Court of Missouri aptly observed:

> In Newlon the state peppered its "send a message" argument with the names of Manson, Speck, and Son of Sam, even though there was no connection of those crimes to facts in the case under consideration. In contrast to Newlon, the state's reference [in the instant case] to the Manson "family" was quite limited and relevant to explain how a leader can manipulate his followers. Additionally, the court in Newlon found error in the totality of the state's argument which also included, "If [defendant] was going to harm your child, would you kill him? . . . If you think you would have, kill him now. Kill him now . . .. I'm talking to you as prosecuting attorney of this county — the top law enforcement officer in St. Louis County." 885 F.2d at 1342. Newlon is distinguishable.

887 S.W.2d at 388. Shurn v. Delo, 177 F.3d 662 (8th Cir.), cert. denied, 528 U.S. 1010 (1999), and Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995), cert. denied, 516 U.S. 1067 (1996), are distinguishable on similar grounds.

C.

Finally, petitioner contends that the prosecutor appealed to racial prejudice in his penalty-phase closing argument. In describing some of the defendant's witnesses, the prosecutor said:

> What other things do we know about the defendant? Did you notice who came in here? Did you notice who his friends were? Is there some significance there? Think about it for awhile. Normally they were female. Normally

-15-

they were white. Normally they were middle class. Normally they had a problem at home, self esteem, something else. Normally they were not physically what you would call overly attractive.

Tr. 2702. No objection was made to this statement. Certainly it is true that the race of the defendant's witnesses was not relevant. Petitioner argues that the jury was improperly invited to take race into account. He points out that the victims were white, and that he, Gray, was black. On the other hand, one of the co-conspirators was white.

We do not see that any substantial prejudice resulted from these isolated remarks. In her closing argument, defense counsel pointed out that the race of Gray's friends was not relevant, and that the sentencing decision was a "human decision." Tr. 2716. The court instructed the jury that the arguments of counsel are not evidence. On this record, we have no reason to believe that the instruction was not effective. The evidence of petitioner's involvement was not so overwhelming as to make a verdict of death inevitable, but it was strong. More than this would be required for us to disregard the presumption that the jury gave no consideration to the irrelevant factor of race. As the Supreme Court of Missouri said, "[t]here is no significant likelihood that racial bias influenced the jury in this case." State v. Gray, supra, 887 S.W.2d at 388.

IV.

We have considered all of the arguments included within the certificate of appealability with the seriousness and gravity that the nature of the case demands. We hold that they are without merit. We express our appreciation to court-appointed counsel for petitioner for their dedicated service.

-16-

The judgment of the District Court, dismissing with prejudice the petition for writ of habeas corpus, is

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.