23CA1760 Peo in Interest of PM 09-19-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1760
Arapahoe County District Court No. 21JV229
Honorable Don J. Toussaint, Judge

The People of the State of Colorado,

Appellee,

In the Interest of P.M., Child-Appellant,

and L.M-J., a Child,

and Concerning A.M.,

Appellant.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Welling and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 19, 2024

Ron Carl, County Attorney, Sarah Simchowitz, Assistant County Attorney, Aurora, Colorado, for Appellee

Sheena Knight, Counsel for Youth, Brighton, Colorado, for P.M.

Jenna L. Mazzucca, Guardian Ad Litem for L.M-J.

Harald Van Gaasbeek, Office of Respondent Parents' Counsel, Fort Collins, Colorado, for Appellant

¶ 1     A.M. (mother) appeals the judgment terminating her parent-child legal relationships with her children, P.M. and L.M-J. The older child, P.M., through counsel for youth (CFY), also appeals the termination judgment as to her. We affirm.

## I.     Background

¶ 2     In September 2020, the Pueblo County Department of Human Services filed a petition in dependency and neglect, alleging, among other things, physical abuse of P.M., neglect of the children, and substance abuse and mental health concerns for mother. Several months later, the juvenile court adjudicated the children dependent and neglected and adopted a treatment plan for mother. Soon thereafter, the court granted mother's request to change venue to Arapahoe County.

¶ 3     The Arapahoe County Department of Human Services (Department) developed and submitted an amended treatment plan to the juvenile court, which the court adopted in December 2021. The amended treatment plan required mother to (1) communicate with the Department; (2) complete a substance abuse evaluation and participate in substance abuse treatment; (3) maintain

1

employment or a legal form of income; (4) participate in a mental health evaluation; (5) provide a safe and stable home environment for the children; (6) demonstrate protective parenting; and (7) abstain from further criminal activity and comply with her criminal cases.

¶ 4 The Department initially moved to terminate mother's parental rights in October 2022 before refiling the motion in January 2023. The juvenile court then held a termination hearing over three days between March and September 2023. After hearing the evidence, the court took the matter under advisement before entering a written order terminating mother's parental rights.

## II. Mother's Appeal

¶ 5 Mother asserts that the juvenile court erred by terminating her parental rights for the following reasons: (1) the Department didn't make reasonable efforts; (2) the juvenile court judge should have recused himself from the case; (3) mother's counsel provided ineffective assistance by failing to file a motion for recusal; (4) the court lacked subject matter jurisdiction because it improperly advised mother at the adjudicatory stage of the proceeding; and (5)

counsel provided ineffective assistance by failing to address the improper advisement. As explained in detail below, we disagree with each of mother's contentions.

## A. Reasonable Efforts

¶ 6 Mother first contends that the juvenile court erred by failing to consider whether the Department made reasonable efforts. In the alternative, she contends that the evidence was insufficient for the court to find that the Department made reasonable efforts. We disagree with both contentions.

### 1. Applicable Law and Standard of Review

¶ 7 The juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child was adjudicated dependent and neglected; (2) the parent hasn't complied with an appropriate, court-approved treatment plan or the plan hasn't been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c), C.R.S. 2024.

¶ 8 Before a juvenile court may terminate parental rights under section 19-3-604(1)(c), the county department of human services must make reasonable efforts to rehabilitate parents and reunite

families.  §§ 19-3-100.5(1), 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2024.  Reasonable efforts means the "exercise of diligence and care" to reunify parents with their children.  § 19-1-103(114).

¶ 9    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  Among the services required under section 19-3-208 are screenings, assessments, and individual case plans for the provision of services; home-based family and crisis counseling; information and referral services to available public and private assistance resources; family time; and placement services.  § 19-3-208(2)(b).

¶ 10    The juvenile court should consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.  The parent is ultimately responsible for using the services to comply with the plan, *People in*

*Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011), and the court may consider a parent's unwillingness to participate in treatment in determining whether the department made reasonable efforts, *see People in Interest of A.V.*, 2012 COA 210, ¶ 12.

¶ 11　　Whether a department of human services satisfied its obligation to make reasonable efforts is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings for clear error but review de novo its legal determination, based on those findings, as to whether the department satisfied its reasonable efforts obligation. *Id.*

2.　　Analysis

¶ 12　　Mother first argues that the juvenile court erred by failing to make an express finding that the Department had made reasonable efforts. But section 19-3-604 doesn't require an express finding. Instead, section 19-3-604(2) directs the court to *consider* a nonexhaustive list of factors to determine whether a parent is unfit, including whether "[r]easonable efforts by child-caring agencies [were] unable to rehabilitate the parent." In other words, while a consideration of reasonable efforts is required, a court must only

5

make findings as to the criteria in section 19-3-604(1)(c) to terminate parental rights. *See People in Interest of T.L.B.*, 148 P.3d 450, 457 (Colo. App. 2006) (noting that the court's findings are adequate as long as they conform to the termination criteria in section 19-3-604).

¶ 13    The juvenile court made findings as to each of the criteria for termination in section 19-3-604(1)(c). The court's written ruling also recounted evidence related to the services provided by the Department and discussed the specific arguments that mother advances on appeal and which we address below (i.e., caseworker contact and the psychological evaluation). We therefore discern no basis to reverse the court's judgment because of its lack of an express reasonable efforts finding. *See Foster v. Phillips*, 6 P.3d 791, 796 (Colo. App. 1999) ("When the ruling, in the context of the record, is sufficient to determine its basis, and the record is sufficient to support the award, a failure to make express findings does not require reversal."); *see also A.S.L.*, ¶ 15 ("Failure of the court to make express findings, on its own, does not establish a

failure by the court to ensure that the Department made reasonable efforts.").

¶ 14     We also reject mother's assertion that the evidence wasn't sufficient to establish that the Department made reasonable efforts. Recall that mother's treatment plan required, among other things, that she address her substance abuse and mental health issues, attend family time, and demonstrate parental protective capacity. The record shows that the Department referred mother for a dual diagnosis evaluation, individual therapy, monitored sobriety testing, supervised family time services, and a parenting class. The caseworker testified that mother completed the evaluation, but she inconsistently participated in the therapy and continued to test positive for methamphetamine. The record also shows that, although mother attended family time, her visits remained at the supervised level after more than two years. Finally, the caseworker said that she offered mother parenting classes through the Department, as well as an online option, but mother didn't complete a class.

¶ 15    In sum, the record shows that the Department provided mother with the necessary resources for her to complete her treatment plan, but she didn't take advantage of those resources to become a fit parent.  *See A.V.*, ¶ 12; *J.C.R.*, 259 P.3d at 1285. Nevertheless, mother asserts, for the following two reasons, that the Department failed to make reasonable efforts.

¶ 16    First, mother asserts that the Department didn't make reasonable efforts because the caseworker "failed to communicate with [her] for the majority of the case."  However, the caseworker testified that, although she didn't properly document every contact with mother during the case, she attempted to contact mother every month during the case and mother was often unresponsive.  And although the caseworker admitted that she wasn't able to arrange one-on-one meetings with mother for extended periods, the caseworker still met with mother in person at team meetings and court hearings during those times.  Ultimately, mother hasn't pointed us to anything in the record suggesting that these issues prevented her from receiving the services that she needed to complete her treatment plan.  *See S.N-V.*, 300 P.3d at 915.  Thus,

8

under these circumstances, we can't say that the Department failed to make reasonable efforts because of any alleged failure of communication. *See My.K.M.*, ¶ 33.

¶ 17　Second, mother contends that the Department failed to make reasonable efforts because the caseworker didn't timely refer her to a psychological evaluation. To begin, we note that mother's treatment plan didn't require her to complete a psychological evaluation, and the mental health evaluation that she completed didn't recommend one. Nevertheless, the record shows that, around April 2022, mother agreed to submit to a psychological evaluation. The caseworker made a referral by filling out an online form in June 2022, but after mother's attorney contacted the caseworker to ask about the psychological evaluation in October 2022, the caseworker resubmitted the form. Thereafter, mother completed the evaluation in November 2023.

¶ 18　Mother maintains that, if the caseworker had completed the psychological evaluation referral sooner, she could have become fit. But the psychological evaluation included recommendations, such as abstinence from substances and engagement in outpatient

substance abuse therapy, that mother was already required to do. And the record shows that mother never demonstrated sobriety and didn't consistently participate in therapy during the case. What's more, mother's therapist testified that he didn't need the psychological evaluation to address mother's most "pressing" issues. Therefore, under these circumstances, we aren't convinced that a short delay in completing the referral for mother resulted in a lack of reasonable efforts from the Department.

### B. Disqualification for Actual Bias

¶ 19 Mother next asserts that the juvenile court judge was biased in favor of the Department and should have recused himself from the case. We disagree.

#### 1. Applicable Law, Preservation, and Standard of Review

¶ 20 "Basic to our system of justice is the principle that a judge must be free of all taint of bias and partiality." *People v. Jennings*, 2021 COA 112, ¶ 18. A judge may be disqualified from presiding over a matter based on (1) an appearance of impropriety or (2) actual bias. *People in Interest of A.P.*, 2022 CO 24, ¶ 26.

¶ 21 The Colorado Code of Judicial Conduct requires a judge to recuse himself from a case based on the appearance of impropriety

when "the judge's impartiality might reasonably be questioned." C.J.C. 2.11(A); *see also People in Interest of A.G.*, 262 P.3d 646, 650 (Colo. 2011) (even if a judge may be able to act impartially, "the judge is disqualified nonetheless because a reasonable observer might have doubts about the judge's impartiality"). "The purpose behind disqualifying a judge who has the appearance of partiality is to protect public confidence in the judiciary." *Jennings,* ¶ 19.

¶ 22    "Actual bias, on the other hand, exists when, in all probability, a judge will be unable to deal fairly with a party . . . ." *A.P.,* ¶ 28. A claim of actual bias focuses on the "subjective motivations of the judge," *Jennings,* ¶ 20, and requires disqualification when a judge "has a personal bias or prejudice concerning a party or a party's lawyer," C.J.C. 2.11(A)(1). Unlike provisions prohibiting a judge from presiding over a case involving an appearance of impropriety, the purpose behind disqualifying a judge for actual bias is to ensure that the parties to a case receive a fair and impartial trial. *A.P.,* ¶ 28; *A.G.,* 262 P.3d at 651. "Only when a judge was actually biased will we question the reliability of the proceeding's result." *A.P.,* ¶ 29.

¶ 23    To establish a claim for actual bias, a party must show that a judge had a "substantial bent of mind against him or her," *People v. Drake*, 748 P.2d 1237, 1249 (Colo. 1988), or a "deep-seated favoritism . . . that would make fair judgment impossible," *A.P.*, ¶ 31 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). The record must clearly demonstrate the judge's actual bias. *Jennings*, ¶ 28. "Bare assertions and speculative statements are insufficient to satisfy the burden of proof." *A.P.*, ¶ 30. Indeed, disqualification for an actual bias is exceedingly rare. *See, e.g.*, *Jennings*, ¶ 30 (no actual bias when the judge told the defendant's attorney that "when I saw you enter in this case I knew there were going to be issues because there are almost always issues with you"); *People v. Dobler*, 2015 COA 25, ¶ 12 ("While the judge's statements that he would be 'haunt[ed]' by his decision to grant probation showed the judge was affected by his prior decision to be lenient with defendant, it is not enough to establish that the judge was unable to sentence defendant fairly.").

¶ 24    Under C.R.C.P. 97, a party may move to disqualify a judge who is "interested or prejudiced" for or against a party. *See Bocian*

*v. Owners Ins. Co.*, 2020 COA 98, ¶ 13; *see also* C.R.J.P. 1 (when a matter is not covered by the Colorado Rules of Juvenile Procedure or the Colorado Children's Code, then the Colorado Rules of Civil Procedure apply). Mother's counsel didn't file a motion to disqualify the judge in this case, and therefore mother concedes that this issue isn't preserved for appeal. She asserts that we should nevertheless address her argument under one of the exceptions to the preservation rule. *See, e.g., People in Interest of M.B.*, 2020 COA 13, ¶ 21 (recognizing that appellate courts may review unpreserved errors to avert a miscarriage of justice).

¶ 25    However, we don't need to consider the exceptions to the preservation rule to reach the merits of her claim. Although a parent may waive an argument that a judge should recuse himself based on an appearance of partiality by failing to file a timely motion to disqualify in the juvenile court, a claim of actual bias can't be waived and therefore a party may raise an actual bias claim for the first time on appeal. *See Jennings*, ¶ 21*; A.G.,* 262 P.3d at 651-53; *see also Dobler*, ¶ 7. We don't read mother's argument to raise an appearance of partiality issue; rather, the argument is that

13

the judge demonstrated actual bias. Therefore, her counsel didn't need to preserve her argument for us to review it on appeal.

¶ 26 We review de novo a claim for disqualification based on actual bias. *Dobler*, ¶ 8; *see also Jennings*, ¶ 27.

### 2. Analysis

¶ 27 At a hearing in January 2023, P.M.'s CFY mentioned that she had emailed the judge because P.M. wanted to meet with the judge "in person." The CFY said that she could "settle that off-record once everybody goes." A few weeks later, the judge conducted an in camera interview with P.M., at which the caseworker and CFY were also present. At the end of the interview, the judge invited P.M. to "come back and talk" further.

¶ 28 About two months later and after the first day of the termination hearing, the judge met with P.M. again. The CFY and caseworker also attended the follow-up interview, as did a Department intern.

¶ 29 Before the interview formally began, the caseworker left the room to let the CFY into the building, and a conversation occurred between the judge, P.M., and the intern. P.M. asked the judge

whether he knew the caseworker, to which the judge responded that he had "known her for two years," she "appear[ed] before [him] all the time," and she was "one of [his] favorite caseworkers believe it or not." The intern also expressed her opinion that the caseworker knew "how to do her job professionally." The judge added, "And I actually, I trust her 100 percent. So usually, (indiscernible) and she makes her report and she makes recommendations (indiscernible). I believe she knows what she's talking about." The intern then said, "So you've got to listen to her, [P.M]."

¶ 30    Mother maintains that the judge's statement that he trusted the caseworker "100 percent" establishes that the judge was biased in favor of the caseworker and, by extension, the Department. Specifically, she contends that, because the judge trusted the caseworker "100 percent," he would necessarily believe all her testimony without any thought to whether it was credible. As a result, mother asserts, she couldn't receive a fair and impartial trial.

¶ 31    Because the record doesn't clearly establish actual bias on the judge's part, we reject mother's argument. *See Jennings*, ¶ 28. In our opinion, the judge's statement that he "trust[ed]" the caseworker "100 percent" was not an indication that he had prejudged the case or the caseworker's credibility. Rather, we think that the judge's comments were an attempt to convince P.M. to trust the caseworker, so that the caseworker could assist the child in the case. And other comments made by the judge in his conversation with P.M. indicate that he hadn't prejudged the case. *See A.P.*, ¶ 37 (comments made by the judge during the case indicated "compassion" rather than bias). For example, he told P.M. that he didn't "make a decision until after everything comes in," had "no idea where [he was] leaning to," and would take all the witness testimony "into consideration."

¶ 32    As noted above, a determination that a judge has actual bias is rare. In fact, mother doesn't cite any case in which an appellate court reversed a judgment for actual bias, and we were hard-pressed to find one. One example from over thirty years ago involved a judge in a criminal case who held the defendant's

16

attorneys in contempt based on unsupported allegations and then arbitrarily denied the prosecution's motion to dismiss charges against the defendant. *Brewster v. Dist. Ct.*, 811 P.2d 812, 814 (Colo. 1991). We see "nothing so egregious" in the record of the present case. *Jennings*, ¶ 31.

¶ 33 Mother submits that the judge exhibited his bias for the caseworker when he (1) "agreed with [the] caseworker's arguments and assertions about [mother's] unfitness and ability to become fit" and (2) didn't consider her argument that the caseworker failed to make reasonable efforts for mother. As to the former, the caseworker's opinions were based on mostly uncontroverted evidence that mother continued to actively use substances more than two years after the juvenile court adopted a treatment plan for her. As to the latter, we have already concluded that the court didn't have an obligation to make a finding of reasonable efforts, it did consider mother's argument about reasonable efforts, and the evidence was sufficient to establish that the Department made reasonable efforts. In sum, we aren't convinced that the court's factual findings and legal conclusions demonstrate that the judge

was biased.  *See A.P.,* ¶32 ("[A]dverse legal rulings by a judge are unlikely to provide grounds for a bias claim, as they are proper grounds for appeal, not for recusal.").

## C.    Ineffective Assistance for Failing to Move for Recusal

¶ 34    Because mother's assertion that the judge exhibited actual bias against her is without merit, her assertion that her counsel provided ineffective assistance by failing to move the juvenile court judge to recuse from the case necessarily fails.  *See Gray v. Bowersox,* 281 F.3d 749, 756 n.3 (8th Cir. 2002) (where the underlying claim is without merit, a claim of ineffective assistance of counsel in not making it isn't viable).

## D.    Subject Matter Jurisdiction

¶ 35    Mother also asserts that the juvenile court improperly advised her that it had to enter an adjudication judgment before it could grant her motion for a change of venue.  As a result, mother maintains, the court erroneously adjudicated the child dependent and neglected.  And because the court erred by entering the adjudication, mother asserts that the court didn't acquire continued subject matter jurisdiction over the case.

¶ 36    "Subject matter jurisdiction concerns the court's authority to deal with the class of cases in which it renders judgment." *People in Interest of E.H.*, 837 P.2d 284, 290 (Colo. App. 1992). The juvenile court has "exclusive original jurisdiction in proceedings . . . [c]oncerning any child who is neglected or dependent." § 19-1-104(1)(b), C.R.S. 2024. Thus, in a dependency and neglect proceeding, the court's jurisdiction rests on the status of the child as dependent and neglected. *People in Interest of J.W. v. C.O.*, 2017 CO 105, ¶ 20.

¶ 37    A judgment entered by a juvenile court lacking subject matter jurisdiction is void. *People in Interest of T.W.*, 2022 COA 88M, ¶ 25. The issue of subject matter jurisdiction can't be waived, and it can be raised for the first time on appeal. *People in Interest of N.D.V.*, 224 P.3d 410, 414 (Colo. App. 2009). However, a timely appeal is a jurisdictional prerequisite for an appellate court to hear an appeal. *See People in Interest of M.R.M.*, 2021 COA 22, ¶ 42.

¶ 38    Although mother characterizes her appellate claim as a challenge to the juvenile court's subject matter jurisdiction to terminate her parental rights, the basis of mother's contention is

that the court erred by adjudicating the child dependent and neglected. We can't consider mother's challenge to the adjudication because her appeal of that issue is untimely.

¶ 39 In a dependency and neglect case, a judgment of adjudication becomes final and appealable upon entry of the initial dispositional order, *see People in Interest of H.T.*, 2019 COA 72, ¶ 16, and a parent has twenty-one days from the entry of that dispositional order to file an appeal, *see* C.A.R. 3.4(b)(1). A challenge to an adjudication judgment must be raised in a timely appeal from that stage of the dependency and neglect proceeding, and the parent may not wait until the termination judgment is entered to challenge the adjudication judgment. *See People in Interest of C.B.*, 2019 COA 168, ¶ 18.

¶ 40 Mother didn't timely file a notice of appeal of the adjudication judgment after entry of the dispositional order. Therefore, because mother's appeal of the adjudication is now untimely, we lack jurisdiction to reach the merits of her claim, including her assertion that an error at the adjudicatory phase deprived the juvenile court of subject matter jurisdiction going forward. *See People in Interest*

*of A.E.*, 994 P.2d 465, 467 (Colo. App. 1999); *see also C.B.*, ¶ 22 ("Because [the parent's] challenge to the adjudication is untimely, we cannot consider whether or how a flawed adjudication might have affected the later termination.").

E.    Ineffective Assistance by Not Challenging the Advisement

¶ 41    Finally, mother asserts that her counsel provided ineffective assistance by failing to address the juvenile court's inaccurate advisement. We discern no basis to remand for an evidentiary hearing.

¶ 42    In evaluating a claim of ineffective assistance of counsel, we employ the same test that we would employ when evaluating an ineffective assistance of counsel claim in a criminal case. *See A.R. v. D.R.*, 2020 CO 10, ¶¶ 48, 60. Under this test, the parent must establish that (1) counsel's performance was outside the wide range of professionally competent assistance and (2) the parent was prejudiced by counsel's deficient performance — that is, there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id.* at ¶ 60.

¶ 43 In dependency and neglect cases, an appellate court must remand for an evidentiary hearing if the parent's allegations are sufficiently specific and compelling to constitute a prima facie showing of ineffective assistance of counsel. *Id.* at ¶ 63. However, if the parent's allegations lack sufficient specificity, the court may summarily deny the ineffective assistance claim. *Id.*

¶ 44 Section 19-3-201(2), C.R.S. 2024, allows a juvenile court to grant a change of venue "to the court in the county where the child's legal parent or guardian resides" if the court has (1) adjudicated the child dependent and neglected or (2) entered a deferred adjudication under section 19-3-505(5), C.R.S. 2024. Mother asserts that the court improperly advised her that it could not change venue until the child was adjudicated dependent and neglected. In other words, she maintains that the court didn't advise her that it could also change venue after entering a deferred adjudication. Mother maintains that her attorney provided ineffective assistance by not knowing the requirements to change venue and by failing to correct or object to the incorrect statements.

¶ 45 We disagree with mother for the following reasons:

1. Because the record doesn't indicate that a deferred adjudication was ever an option for mother, her counsel couldn't have provided ineffective assistance by failing to challenge the court's advisement. *See* § 19-3-505(5)(a) (the parties must "consent" to a deferred adjudication before the court enters one).

2. Even if mother knew about the deferred adjudication option and such an adjudication was an option for her, she would still have been required to waive her right to a trial and admit to the allegations for the court to change venue. *See* § 19-3-505(5), (7)(a) (requiring the court to first find that the allegations in the petition are supported by a preponderance of the evidence before entering a deferred adjudication).

3. Mother doesn't assert that the outcome of the adjudication proceeding would have been different if she would have proceeded to trial. *See A.R.*, ¶ 60. Rather, she only asserts, at most, that, but for counsel deficient performance, she wouldn't have admitted to an adjudication. But mother was also required to allege that she would have prevailed at a trial if she

23

had exercised her right to a trial, and she hasn't done so. And it is undisputed that mother was using substances and that her substance use placed the children at risk of harm, such that there is no reasonable probability that the children would not have been adjudicated dependent or neglected under section 19-3-102, C.R.S. 2024.

### III. P.M.'s Appeal

¶ 46 P.M. asserts that the juvenile court erred by finding that mother was unfit and unlikely to become fit within a reasonable time. We disagree.

### A. Applicable Law and Standard of Review

¶ 47 An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 48 In determining whether a parent's conduct or condition is likely to change within a reasonable time, the juvenile court may

consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). Where a parent has made little to no progress on a treatment plan, the court isn't required to give the parent additional time to comply. *See People in Interest of R.B.S.*, 717 P.2d 1004, 1006 (Colo. App. 1986); *see also People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998) (noting that even "increased compliance" over the course of a case may not justify additional time).

¶ 49    A "reasonable time" isn't an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *A.J.*, 143 P.3d at 1152. What constitutes a reasonable time is fact-specific and varies from case to case. *People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007).

¶ 50    Whether the juvenile court properly terminated parental rights is a mixed question of fact and law. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for

clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

## B. Analysis

¶ 51 The juvenile court found that mother was unfit primarily because she continued to use methamphetamine and wasn't able to demonstrate that she could properly care for the children. *See* § 19-3-604(2)(e) (stating that a parent may be unfit based on "[e]xcessive use of . . . controlled substances . . . , which affects the ability to care and provide for the child"). Specifically, the court noted that the evidence showed that mother (1) didn't comply with her treatment plan; (2) agreed to buy P.M. a marijuana vape pen, even though the child was only thirteen years old; and (3) believed that it was acceptable for her to continue to use methamphetamine if she didn't do so in the children's presence. *See People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008) (a parent's noncompliance with a treatment plan generally "demonstrates a lack of commitment to meeting the child's needs and, therefore, may also be considered in determining unfitness").

26

¶ 52    The record supports the juvenile court's findings.  The caseworker testified that mother had tested positive for methamphetamine multiple times throughout the case.  In fact, mother admitted to regularly using methamphetamine, including just eight days before the final day of the termination hearing.  The record also shows that mother had unauthorized contact with P.M. and that, during one of their conversations, mother agreed to buy P.M. a marijuana vape pen.  Mother admitted to offering to buy the vape pen, but she claimed that she never intended to honor that promise.  Finally, mother testified that, if the children were returned to her, and she were to use methamphetamine, she would do so only when they were at school or sleeping.

¶ 53    The juvenile court also found that mother was unlikely to become fit within a reasonable time, noting that the case had "languished for over two years" with insufficient progress on mother's part.  *See R.B.S.*, 717 P.2d at 1006.  The court noted that mother had admitted that she was "an addict" and that "the struggles in her life have impeded her ability to parent [the]

27

children." The court believed that "the challenges" that mother faced would be "long and arduous."

¶ 54    The record supports these findings. Mother testified that she used methamphetamine for several years before the case began and continued to use it throughout the case. She also testified that she hadn't fully engaged in her substance abuse and mental health treatment. Indeed, mother denied using substances in her dual diagnosis evaluation. The caseworker opined that mother couldn't become fit until she completed her treatment plan, successfully participated in her substance abuse treatment, and established a pattern of sobriety. The caseworker further opined that, in the "best-case scenario," mother could complete those steps in a year. But considering that the case was already two years old, the caseworker didn't think that leaving the case open would be in the children's best interests.

¶ 55    P.M. asserts that the juvenile court erred because the record shows that mother demonstrated "significant change." For example, P.M. notes that mother engaged in therapy and displayed positive changes in her behavior, started taking medications that

28

helped her to regulate and function, and had taken steps to engage in sober living. But the court considered this evidence along with the other evidence described above and still found, with record support, that mother was unlikely to become fit within a reasonable time. *See V.W.*, 958 P.2d at 1134-35. We therefore reject P.M.'s contention because it would require us to reweigh the evidence to reach a different result, which we can't do. *See People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

¶ 56    P.M. also maintains that the juvenile court erred because the record establishes that mother could become fit within a year, and when considering their needs, another year was a reasonable time. However, the caseworker testified that it was a "best-case scenario" that mother could become fit within in a year. In other words, if mother started fully complying with her treatment plan and abstained from using substances, then she *might* be able to become fit in a year's time. The caseworker testified that mother had not given any indication that she was ready to do so.

¶ 57    Finally, P.M. asserts that the juvenile court erred in light of the evidence showing that P.M. wasn't in a permanent home and

wasn't willing to consent to an adoption. *See* § 19-5-203(2), C.R.S. 2024 (requiring written consent to an adoption from a child who is twelve years of age or older). P.M. notes that the record established a need for stability, but termination could result in less stability, not more. To be sure, the caseworker testified that P.M. needed stability as soon as possible, considering the length of the case. The caseworker also noted that P.M. had only recently objected to adoption and that another change of mind wasn't unforeseeable. She also opined that P.M. was a good candidate for adoption, despite being thirteen years old, and once a termination judgment was entered there would be more possibilities for adoptive homes. The court considered this information and still determined that termination was in P.M.'s best interests because reunification with mother wasn't possible in a reasonable time. Therefore, the record shows that the court considered P.M.'s specific needs when it reached its decision, and as a result, we can't say that the court erred by finding that mother couldn't become fit within a reasonable time.

## IV. Disposition

¶ 58    The judgment is affirmed.

JUDGE WELLING and JUDGE SCHOCK concur.